**M–I LLC, Plaintiff,**

v.

**Chad Lee STELLY et al., Defendants.**

**Civil Action No. 4:09–cv–1552.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 17, 2010.

---

Ben L. Aderholt, Looper Reed et al., Houston, TX, for Plaintiff.

Craig D. Dillard, Michel Perez, Boyar and Miller PC, Roger B. Greenberg, Jason Paul Sharp, Schwartz Junell Greenberg Oathout LLP, Houston, TX, for Defendants.

## MEMORANDUM AND ORDER

KEITH P. ELLISON, District Judge.

Pending before the Court are Defendants' Joint Motion to Dismiss for Plaintiff's Failure to State a Claim (Doc. No. 91); Defendants Benton T. Knobloch and Wellbore Energy Solutions, LLC's Motion for Partial Summary Judgment as a Matter of Law (Doc. No. 181); Defendants' Joint Expedited Motion for Protection from Discovery of Proprietary Trade Secret Information (Doc. No. 300). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendants' motion to dismiss should be granted in part and denied in part, Defendants' motion for partial summary judgment should be granted in part and denied in part, and Defendants' joint expedited motion for protection should be denied.

## I. BACKGROUND

This suit involves the alleged misappropriation of trade secrets and violation of non-compete agreements by former employees of Plaintiff M–I LLC ("M–I"), including Chad Stelly, Stephen Squyres, and Benton T. Knobloch, three of the Defendants in this case.[1]

M–I LLC ("M–I") is an oilfield contractor that provides "products and services to oilfield drillers and operators who are involved in successful completion of downhole operations and the cleanout of wellbores." (Second Am. Compl., Doc. No. 355, ¶ 8.) Defendants Chad Stelly ("Stelly") and Stephen Squyres ("Squyres") were employees of M–I at its Houston offices. Both employees signed trade secret agreements and covenants not to compete during their employment at M–I. Pursuant to these and other agreements, Stelly and Squyres agreed to maintain confidential all of M–I's trade secrets and proprietary information both during employment and afterward, and also agreed not to compete against M–I for a period of two years after termination of employment. (Id. ¶ 9.) In their employment capacity, Stelly and Squyres specialized in rental and technical support of wellbore cleanout equipment. Stelly and Squyres promoted tools to M–I customers throughout the Gulf of Mexico, Texas, Louisiana, and Alabama. M–I alleges that it "provided and entrusted" to Stelly and Squyres extensive trade secret and other proprietary information, including tool drawings, designs, and specifications. (Id. ¶¶ 10–11.)

Defendant Benton T. Knobloch ("Knobloch") was an employee with Specialised Petroleum Services International, Inc. f/k/a Global Completion Services, Inc. ("SPS/GCS"), which was a subsidiary of SPS Petroleum Services Group Limited ("SPS"). M–I acquired SPS and SPS/GCS on August 2, 2006, and received assignment of all contractual rights. (Id. ¶ 18.) Knobloch signed agreements promising not to disclose any confidential information, solicit SPS/GCS's customers, interfere with SPS/GCS's customer relationships, or compete with SPS/GCS. M–I avers that SPS/GCS and M–I gave Knobloch access to confidential information, including tool drawings, designs, and specifi-

1. Unless otherwise noted, the background facts of this case are not in dispute.

cations. On August 21, 2006, Knobloch resigned his position with M–I, and was thereafter terminated. Knobloch was Manager of Sales for the Americas when his employment with M–I ended. M–I avers that, within one month of leaving his job at M–I, Knobloch formed a new company, Defendant Wellbore Energy Solutions, LLC ("WES"), and began serving as WES's president. (*Id.* ¶ 24.)

After Knobloch formed WES, M–I alleges that he began "raiding" employees from M–I, ultimately hiring a total of thirteen employees from M–I. Squyres joined WES in 2008, and Stelly joined in 2009. M–I asserts that Defendants have both stolen M–I's trade secrets and other confidential information, and violated their respective covenants not to compete. (*Id.* ¶¶ 15–16.) M–I believes that WES designed twelve of its wellbore tools by relying on M–I's trade secrets.

Based on these averments, M–I brings fourteen counts against Stelly, Squyres, Knobloch, and WES. Those counts include: breaches of various employment agreements, including trade secret agreements, covenants not to compete, and confidentiality contracts; common law misappropriation of trade secrets; tortious interference with M–I's customer contracts, prospective business relations, and employment contracts; breach of fiduciary duty; violations of the Texas Theft Liability Act, TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.001–134.005 (Vernon 2005); conspiracy; unfair competition by misappropriation; violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and conversion.

Defendants have filed a motion to dismiss M–I's claims, arguing that they fail to state a claim upon which relief can be granted. They have also filed a motion for summary judgment, arguing that M–I's state tort claims are preempted by federal copyright law, and that Knobloch's covenants not to compete are unenforceable because they are unreasonable restraints of trade. Last, Defendants have filed a motion for protection, arguing that M–I has not made the requisite showing of necessity to obtain trade secret materials in discovery. The Court takes up each of the arguments in turn.

## II. MOTION TO DISMISS

Defendants have filed a joint motion to dismiss for failure to state a claim. They argue that M–I's complaint fails to comply with Rule 8 under the Supreme Court's *Twombly* and *Iqbal* decisions. (Defs.' Joint Mot. to Dismiss for Pl.'s Failure to State Claim, Doc. No. 91, ¶ 14.) Specifically, Defendants argue that the complaint does not contain sufficient allegations to state a claim for misappropriation of trade secrets, fails to state facts in support of M–I's three tortious interference claims, and fails to state more than legal conclusions for the remaining ten claims. (*Id.* ¶¶ 15–19.) M–I responds that Defendants' motion is untimely, and in any case, that their pleading meets Rule 12(b)(6) standards.

### A. Legal Standard

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*,

550 U.S. at 570, 127 S.Ct. 1955). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted).

■ When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir.2004); *see also Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir.2007). A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir.2000). Furthermore, a Court may refer to matters of public record when deciding a motion to dismiss. *Chauhan v. Formosa Plastics Corp.,* 212 F.3d 595, 595 (5th Cir.2000).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal,* 129 S.Ct. at 1950 (citation omitted). But the court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted

deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir.2005) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir.2004)). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir.2004).

**B. Analysis**

The Court notes, at the outset, that subsequent to Defendants' motion to dismiss, M–I amended its complaint. The live pleading is M–I's Second Amended Complaint (Doc. No. 355). The Court will apply the motion to dismiss to the live pleading.

**1. Waiver**

The Court first considers whether Defendants have waived their Rule 12(b)(6) arguments by filing responsive pleadings before moving to dismiss. Defendants answered M–I's original complaint. (*See* Doc. Nos. 7, 9, & 28.) They now move to dismiss M–I's amended complaint. M–I argues that Defendants have waived their Rule 12(b)(6) arguments, because the rule "expressly mandates" that a motion brought pursuant to the rule "'shall be made before pleading.'" (Pl. M–I LLC's Resp. to Defs.' Mot. to Dismiss for Failure to State a Claim Pursuant to FRCP 12(b)(6) & Mot. for Leave to File Am. Compl., Doc. No. 113, at 2 (quoting FED. R. CIV. P. 12(b)(6).) Because Defendants already filed responsive pleadings to M–I's original complaint, M–I argues that they may not now oppose an amended complaint. Defendants respond that their motion is timely and not waived. They argue that, because Defendants are allowed to file a responsive pleading to M–I's amended complaint, they are also allowed to "challenge that complaint's validity under

Rule 12(b)(6)." (Defs.' Reply to Pl.'s Resp. to Their Joint Mot. to Dismiss for Failure to State a Claim, Doc. No. 180, ¶ 2.)

Defendants rely on *Bromfield v. McBurney* in arguing that their motion to dismiss is timely. In that case, the defendants moved to dismiss plaintiff's original complaint. The court subsequently ordered plaintiff to file an amended complaint curing certain deficiencies. The plaintiff did so, and defendants filed a second motion to dismiss. Plaintiff responded that the defendants motion should be denied, because only one 12(b)(6) motion could be filed. The court rejected that argument, noting that Rule 12(b)(6) "merely provides that a motion asserting a defense for failure to state a claim upon which relief can be granted, or any of the other specific defenses set forth therein, 'must be made before pleading if a responsive pleading is allowed.'" 2008 WL 2746289, at *1 (W.D.Was. July 8, 2008) (quoting Fed. R.Civ.P. 12(b)). Because the plaintiff had filed an amended complaint, the court held that the defendants were once again entitled to challenge its validity under Rule 12(b)(6).

Though *Bromfield* supports Defendants' general argument that an amended complaint grants defendants the opportunity to challenge its validity anew under Rule 12(b)(6), the circumstances of the cases are different. The defendants in *Bromfield* never answered the original complaint. Instead, they challenged both the original and amended complaint on Rule 12(b)(6) grounds. In this case, by contrast, each Defendant answered M–I's original complaint, and urged this Court to dismiss on 12(b)(6) grounds only after the amended complaint had been filed.

██ The Court does not have to decide that question, however, because Defendants prevail for another reason. Each Defendant raised the defense of failure to state a claim upon which relief can be

granted in their answers. (*See* Chad Stelly's Am. Answer, Doc. No. 7, ¶ 89 ("Stelly affirmatively asserts that M–I's claims are barred, in whole or in part, because M–I has failed to state a claim upon which relief may be granted"); Stephen Squyres' Am. Answer, Doc. No. 9, ¶ 89 (same); Defs. Benton Knobloch & Wellbore Energy Solutions, LLC's Original Answer and Counterclaim, Doc. No. 28, ¶ 95 ("Knobloch and [WES] plead failure to state a claim").) Rule 12(b) provides that "[n]o defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading." Rule 12(i) provides that "[i]f a party so moves, any defense listed in Rule 12(b)(1)-(7)—whether made in a pleading or by motion ... must be heard and decided before trial unless the court orders a deferral until trial." Fᴇᴅ. R. Cɪᴠ. P. 12(i). Because the Defendants' motion to dismiss is based on a defense they raised originally in their answers, M–I's waiver argument fails. *See Desperado Motor Racing & Motorcycles, Inc. v. Robinson,* 2010 WL 2757523, at *3 (S.D.Tex. July 13, 2010).

### 2. Misappropriation of trade secrets

██ Defendants aver that M–I has failed to plead adequately its misappropriation of trade secrets claim. Under Texas law, the elements of misappropriation of trade secrets are: (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff. *CQ, Inc. v. TXU Mining Co.,* 565 F.3d 268, 273 (5th Cir.2009) (quoting *Gaia Techs. Inc. v. Recycled Prods. Corp.,* 175 F.3d 365, 376 (5th Cir.1999)). A trade secret is defined as a " 'formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competi-

tors who do not know or use it.'" *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir.2007) (quoting *Taco Cabana Int'l v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir.1991)).

■ M–I's Second Amended Complaint alleges that Stelly, Squyres, and Knobloch had access to "nonconformance reports, tool drawings, tool designs, tech units, tool utility reports, scrap reports, job proposals and procedures, sales forecasts, job tracker, customer preferences, tool research and developments and project information," and other confidential information. (Doc. No. 355, ¶ 11; *see also id.* ¶ 19.) M–I further alleges that Defendants induced Stelly to misappropriate M–I's technology and trade secrets for use in WES's business operations, and that:

> In the days before he notified M–I that he was quitting, Stelly connected external memory devices to his M–I laptop and transferred files to these devices from the laptop. A forensic analysis of Stelly's External Hard Drive and USB Drive revealed that M–I's files were on these devices and that some of these files had been transferred from Stelly's laptop. In addition, on March 8, 2009, Stelly began downloading M–I's files on to his M–I laptop immediately after ending a cell phone conversation with Knobloch. Similarly, on March 6, 2009, Stelly called Knobloch minutes before he plugged in an external memory device to his laptop. Because this computer activity occurred after Stelly accepted em-

ployment with WES and in close proximity to phone calls with Knobloch, M–I has reason to believe that Stelly was accessing M–I's Confidential Information and files for his and for WES's use. (Doc. No. 355, ¶ 15.)[2] Finally, M–I maintains that Knobloch resigned from M–I and immediately formed WES. (*Id.* ¶ 24.) M–I provides a list of fourteen specific tools whose designs and technologies were allegedly used by WES. (*Id.* ¶ 21.)

Nevertheless, Defendants argue that M–I has failed to allege facts to support its claim because there are no facts showing what trade secret was misappropriated, that Nil's trade secrets were actually used or disclosed by Defendants, and what injury was suffered by M–I. The Court disagrees. On the contrary, M–I has alleged that its designs and technologies related to fourteen tools constitute trade secrets, that Defendants took the information in violation of their confidentiality agreements, and have used it to build its own tools. While, of course, it is true that at least some of M–I's allegations rest on circumstantial factual support, the Court believes that, through discovery, M–I may be able to collect evidence of the allegedly unlawful behavior to more fully support its claims. Of course, in the final calculus, it may not be able to prove its allegations and the case could very well be dismissed on a future motion for summary judgment or at trial. What is material at this stage, however, is that M–I has alleged facts that "'raise a right to relief above the specula-

---

2. The Court is aware that there is considerable controversy over this allegation, because M–I initially submitted, and subsequently withdrew, evidence supporting its claims that Stelly had downloaded material from his M–I laptop onto an external hard drive. (*See* Aff. in Supp. of M–I LLC's Emergency Mot. for Prelim. Inj., Doc. No. 14, ¶¶ 12–13; M–I LLC's Notice of Withdrawal of Portions of Keith Pope's Aff., Doc. No. 81.) As Defendants acknowledge, however, it is the Court's

task at this stage to consider only the pleadings in its 12(b)(6) determination. Thus, it must ignore both favorable *and* detrimental evidence that exist outside the pleadings, and focus on the factual allegations in M–I's complaint only. M–I continues to assert that Stelly downloaded sensitive M–I material before leaving his job, and for the purposes of this motion, the Court is bound to accept these allegations as true.

tive level,'" thereby sufficiently stating its claim. *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir.2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court finds that M–I has done so.[3]

### 3. Tortious interference with customer contracts

■ Count Four alleges tortious interference with M–I's customer contracts. A plaintiff must establish the following elements to succeed on a tortious interference with contract claim: (1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss. *Specialties of Mex. Inc. v. Masterfoods USA*, 2010 WL 2488031, at *9 (S.D.Tex. June 14, 2010) (citing *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex.App.-Fort Worth 2009, pet. denied)). Defendants argue that there are "no facts identifying the contracts allegedly interfered with, how the alleged interference proximately caused injury to M–I, ... the identity of the ... third-person interfered with, or actual damage or loss incurred." (Doc. No. 91, ¶ 18.)

■ The Court agrees with Defendants. After combing through M–I's complaint, the Court can discern only two passages that even tangentially put forth facts relating to Nil's tortious interference with customer contracts claim. First, M–I alleges:

> Stelly and Squyres are ... soliciting M–I's customers based on the relationships they formed and further developed while

at M–I. Stelly has solicited and/or is soliciting and renting competing tools to: BP p.l.c., Chevron Corporation, Devon Energy Corporation, Exxon Mobil Corporation, Walter Oil and Gas Corporation, Marathon Oil Corporation, and Eni S.p.A. Squyres is soliciting and renting WES tools primarily to BP p.l.c. just as he did while at M–I.

(Doc. No. 355, ¶ 13.) Second, M–I asserts:

> The Defendants' misappropriation, breaches of contract, and interference has caused M–I substantial harm. M–I has learned that it lost at least one well to WES when BP awarded the ThunderHorse Project 778 # 2 Well to WES instead of M–I because of Squyres's sales efforts. M–I has provided Wellbore cleanout tools and services to BP for other ThunderHorse wells, and expected to provide the same for 778 # 2. Defendants have unfairly competed and continue to unfairly compete with M–I on other projects using M–I's former employees and M–I's Confidential Information. WES was awarded the ThunderHorse 778 # 2 because of Squyres's breach of his contracts with M–I, WES's interference with those contracts, the inevitable use and disclosure of and continued use of M–I's Confidential Information, and the use of M–I's tool designs.

(*Id.* ¶ 29.) The Court finds that these pleadings fail for two reasons. First, while M–I avers that it "had valid contracts with certain customers," it fails entirely to allege or designate a specific contract that is the subject of interference.

---

**3.** Defendants also argue that M–I pleads the inapplicable "inevitable disclosure" doctrine in support of its trade secret misappropriations claims. Defendants claim that the doctrine has not been recognized or adopted by any Texas court, and that this Court expressly held the doctrine inapplicable as a matter of law in the earlier injunction proceedings.

(*See* Mem. & Order, Doc. No. 75, at 12–13.) Because the Court has found that M–I succeeds in setting forth sufficient allegations that Stelly actually downloaded trade secrets before he left M–I, it has no need to consider now whether pleading the "inevitable disclosure" doctrine meets Rule 12(b)(6) requirements.

From the facts recited above, the reader might gather that M–I had business relationships with at least seven different businesses that have since been solicited by, or entered into agreements for services with, WES. Similarly, a reader may surmise that M–I has provided wellbore cleanout tools to BP and maintained some sort of expectation to do the same on the ThunderHorse project. None of these contentions, however, alleges the existence of a *contract* between M–I and any of these businesses that obligated them to use M–I's wellbore cleanout services. Without identifying an existing contract that is subject to interference, M–I has failed to plead adequately the first element of a tortious interference with contract claim.

Second, the Court finds that M–I has failed to adequately plead the proximate cause element of this cause of action. To show proximate cause, "a plaintiff must allege that 'the defendant took an active part in persuading a party to a contract to breach it.'" *Hambric Sports Mgmt., LLC v. Team AK, Inc.*, 2010 WL 2605243, at *9 (N.D.Tex. June 29, 2010) (citing *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir.2008)). "'Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach.'" *Id.* "'It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise.'" *Id.* (quoting *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex.App.-Eastland 1992, writ denied)). Here, it is alleged in M–I's complaint that Stelly and Squyres, in their capacity as salesmen at WES, are soliciting M–I customers for wellbore cleanout projects. Nowhere does M–I set forth facts that allege any kind of interference or persuasion of a party to breach any existing contracts with M–I. There are no facts suggesting that any Defendant has offered better terms or other incentives in order to induce companies to breach their contracts. M–I has therefore failed to plead adequately that Defendants are the proximate cause of any loss of existing contractual relations with companies.

Thus, the Court finds that M–I has not set forth sufficient factual matter that states a plausible claim for relief. *Iqbal*, 129 S.Ct. at 1949. The Court, however, will allow M–I to amend its complaint. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir.2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable of the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.") The Court believes that additional allegations could cure the existing deficiencies.

### 4. Tortious interference with prospective business relations

Count Five alleges tortious interference with prospective business relations. In order to establish this claim, a plaintiff must prove: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Specialties of Mex. Inc. v. Masterfoods USA*, 2010 WL 2488031, at *10 (S.D.Tex. June 14, 2010). Defendants argue that M–I's claim fails because M–I fails to set forth facts

showing "the reasonable probability that M–I would have entered into a business relationship with third persons, independently tortious or unlawful conduct, the identity of the prospective business relationship . . ., or actual damage or loss incurred." (Doc. No. 91, ¶ 18.) Defendants further allege that the facts in support of M–I's tortious interference claim are threadbare recitals of the elements of each cause of action, supported by conclusory statements, and thereby run afoul of *Twombly* and *Iqbal*'s pleading standard.

 M–I counters that it "has produced documents" during discovery "showing that it had a relationship with BP and that it submitted a quote" on the BP ThunderHorse Well project. (Doc. No. 113, ¶ at 10.) The Court may not look to documents not referenced or included in the pleadings when considering a Rule 12(b)(6) motion to dismiss. *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir.2000). Accordingly, it is of no moment that M–I was able to provide factual support for its claim *outside* the pleadings. The purpose of a motion to dismiss for failure to state a claim is to ensure that Defendants have notice of the precise claims against them. Providing piecemeal factual support throughout the life of the case is not an acceptable substitute for Rule 12(b)(6)'s requirement that a plaintiff's pleading contain factual matter that states a " 'claim to relief that is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). The Court will therefore refer to the pleadings in considering whether M–I has failed to state a claim upon which relief may be granted.

 After examining the pleading, the Court concludes that this tortious interference claim falls short of the Rule 12(b)(6) pleading standard. M–I fails to set forth any allegations establishing a reasonable probability that it would have entered into a business relationship. The closest it comes is its averment that it "has provided [w]ellbore cleanout tools and services to BP for other ThunderHorse wells, and expected to provide the same for 778 # 2," but instead lost the project to WES. (Doc. No. 355, ¶ 29.) This statement, however, does not plead a reasonable probability that M–I and BP would have entered into a contractual relationship for the ThunderHorse project. Furthermore, M–I fails to plead any other business relationships that are the subject of this claim.

The Court also finds that M–I has failed to adequately plead the third claim, which requires a plaintiff to establish that the defendant committed an independently tortious act with a conscious desire to prevent the relationship from occurring, or knew the interference was certain or substantially certain to occur as a result of the conduct. M–I has not pled that Defendants committed misappropriation and/or breach of fiduciary duty with a conscious desire to cause, or with the certain knowledge that, it was preventing MI's specific business relationship from forming. For these reasons, M–I's tortious interference with prospective business relations claim is dismissed. M–I may replead.

### 5. Tortious interference with M–I's employment contracts

 Count Six alleges tortious interference with M–I's employment contracts. The elements of a tortious interference with contract claim are: (1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss. *Specialties of Mex. Inc. v. Masterfoods USA,* 2010 WL 2488031, at *9 (S.D.Tex. June 14, 2010) (citing *All Am. Tel., Inc. v. USLD Commc'ns, Inc.,* 291 S.W.3d 518, 531 (Tex.App.-Fort Worth 2009, pet. denied)). The Court is uncertain about Defendants' specific objections

to this Count. Most of Defendants' objections appear to target M–I's other two tortious interference claims, discussed above. In any event, the Court considers whether this claim has been adequately pled pursuant to Defendants' argument that all tortious interference claims ought to be dismissed.

 M–I identifies several contracts as the subject of this interference claim, including the M–I Trade Secret Agreement and Covenant Not to Compete, M–I Employee Invention and Confidential Information Agreement, GCS and SPS Confidentiality Agreements, and/or at-will employment agreements. (Doc. No. 355, ¶ 59.) The Court finds that the first element is satisfied.

Next, as to a showing of willful and intentional interference, M–I pleads, "WES and its agents, including Knobloch and Squyres, knew or had reason to know of those of [the] contracts, specifically the employment agreement[,] and Trade Secret Agreement and Covenant Not to Compete, because Squyres and other WES agents had essentially the same agreements with M–I and WES." (Doc. No. 355, ¶ 60.) M–I alleges further that a number of its employees left M–I to join WES. (*Id.* ¶¶ 24–28.) Finally, M–I alleges:

On March 3, 2009, Knobloch induced Stelly to breach his employee agreement with M–I. Before he quit, Stelly told WES and Knobloch that Stelly had a noncompete agreement with M–I. WES and Knobloch willfully disregarded that M–I contract just as it had disregarded the previously raided employees' contracts with M–I and as it has continued to disregard them.

(*Id.* ¶ 27.) M–I provides enough factual allegations to support the second element of its tortious interference claim.

Third, in order to prove proximate damage, M–I has pled that "Knobloch and WES induced each of aforementioned employees and possibly others to quit M–I for increased compensation and/or other benefits or a total increased employment package." (Doc. No. 355, ¶ 28.) Finally, M–I pleads actual damage in the form of lost employees and the cost of retraining new employees.

Accordingly, the Court finds that M–I has alleged and provided factual support for each element of its tortious interference with employment contracts claim, thereby stating a plausible claim for relief. *Iqbal,* 129 S.Ct. at 1949. The Court denies Defendants' motion to dismiss on this claim.

### 6. The remaining arguments

Defendants do not provide specific arguments for dismissal of each of the remaining claims, but instead aver generally that "the remaining 10 claims are no more than conclusions, which are not entitled to the assumption of truth and are unsupported by factual allegations." (Doc. No. 91, ¶ 19.) Defendants then list a series of arguments aimed at various causes of action. The Court considers each argument in turn:

### a. Texas Theft Liability Act

 Defendants argue that there are no allegations in support of an unlawful appropriation of trade secrets under Texas Penal Code § 31.05, which is required in order to support M–I's Texas Theft Liability Act claim. Section 31.05 provides that a person commits an offense if, without the owner's consent, he knowingly steals a trade secret, makes a copy of an article representing a trade secret, or communicates or transmits a trade secret. TEX. PENAL CODE ANN. § 31.05 (Vernon 2003). As stated above, M–I alleges that, in the days before Stelly notified M–I he was quitting, he transferred files onto an external memory device. (Doc. No. 355, ¶ 15.) The Court finds that this factual allegation is sufficient to support a claim of theft of

trade secrets under the Texas Penal Code, which in turn supports M–I's Texas Theft Liability Act claim. The Court overrules Defendants' objections on this point.

### b. Unfair competition

Count Ten alleges unfair competition by misappropriation against all Defendants. Defendants insist that there are no facts in support of unfair competition. Specifically, Defendants aver that "the complaint is silent on facts to show the creation of M–I's trade secret information through extensive time, labor, skill and money, that Defendants used M–I's trade secrets in competition with M–I or commercial damage with M–I." (Doc. No. 91, ¶ 19.)

In order to show unfair competition by misappropriation, a plaintiff must establish: (1) the creation by plaintiff of a product through extensive time, labor, skill, and money; (2) the use of that product by defendant in competition with plaintiff, thereby giving the defendant a special competitive advantage because he was burdened with little or none of the expense incurred by plaintiff in the creation of the product; and (3) commercial damage to plaintiff. *Cable Elecs., Inc. v. N. Am. Cable Equip., Inc.,* 2010 WL 1541504, at *3 (N.D.Tex.2010) (citing *Alcatel USA, Inc. v. DGI Techs.,* 166 F.3d 772, 788 (5th Cir. 1999)).

M–I emphasizes its efforts in creating wellbore cleanout products in several places in the complaint. For example, M–I avers, "M–I spent considerable amounts to create information [including tool drawings, designs, sales forecasts, tool research and development, market strategies, etc.] This information is M–I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent in research, testing and application." (Doc. No. 355, ¶ 12.) With information

that M–I acquired in its asset purchase agreement with SPS/GCS, M–I states, "SPS/GCS spent considerable amounts of time and money to create this information and develop it. M–I spent a substantial amount of money to obtain the rights to this information. This information is SPS/GCS's and M–I's institutional knowledge and history of its wellbore cleanout tool business. It is the product of many years of experience, dozens of skilled employees' labor, and millions of dollars spent." (*Id.* ¶ 19.) With respect to M–I's tool designs, M–I pleads, "M–I spent considerable amounts of time and money to research and develop this information and keep it secret. M–I employs engineers and designers to research and develop these tool designs. These designers and engineers take years to research and develop a tool, and it takes substantial additional time and money to test and market these tools." (*Id.* ¶ 22.) The Court finds that these averments are sufficient to plead the element of expended time, labor, skill, and money. Though M–I's allegations are not particularly detailed at this point, the Fifth Circuit has instructed that they need not be. What matters, instead, is that M–I sets forth facts that " 'raise a right to relief above the speculative level.' " *Cuvillier,* 503 F.3d 397, 401 (5th Cir.2007) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). The Court concludes that, as to this element, M–I has done so.

Similarly, the Court finds that M–I has pled that WES is using M–I's trade secrets in competition with M–I, and that M–I has suffered commercial damage. M–I has listed twelve WES tools that it claims are being used in competition with its own tools. (Doc. No. 355, ¶ 21.) Further, it has alleged that it has lost at least one project, the BP ThunderHorse well, resulting in commercial damage. (*Id.* ¶ 29.) The Court finds that, through its allegations, M–I has set forth a plausible basis

for recovery under a theory of unfair competition by misappropriation. The Court overrules Defendants' objections on this point.

### c. Computer fraud and abuse

■ Count Eleven alleges violations under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. The CFAA prohibits, among other conduct, the unauthorized access to a " 'protected computer' for the purposes of obtaining information, causing damage, or perpetrating fraud." *Quantlab Techs. Ltd. (BVI) v. Godlevsky,* 719 F.Supp.2d 766, 774, 2010 WL 2593669, at *5 (S.D.Tex. June 23, 2010). A "protected computer" is a "computer ... which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

In its complaint, M–I has two passages that relate to this claim. First, M–I alleges that:

Stelly connected external memory devices to his M–I laptop and transferred files to these devices from the laptop.... In addition, on March 8, 2009, Stelly began downloading M–I files on to his M–I laptop immediately after ending a cell phone conversation with Knobloch. Similarly, on March 6, 2009, Stelly called Knobloch minutes before he plugged in an external memory device to his laptop.

(Doc. No. 355, ¶ 15.) Second, M–I asserts:

Defendants knowingly and with intent to defraud, accessed and used the computer(s) assigned to by M–I, without authorization or in a manner exceeding any authorization they may claim that they had. By means of such conduct, Defendants furthered the intended fraud. M–I believes that, because of Stelly's activities in March 2009, Defendants used M–I's computer to misap-

propriate, use, and share M–I's trade secrets and proprietary Confidential Information without authorization.

(*Id.* ¶¶ 80–81.)

■ The CFAA is a criminal statute, but civil actions are authorized for some violations of its substantive provisions. *Fiber Sys. Int'l, Inc. v. Roehrs,* 470 F.3d 1150, 1156 (5th Cir.2006). Section 1030(g) provides:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i).

The only subclause potentially applicable here is subclause (I), which covers "loss to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value." [4] 18 U.S.C. § 1030(c)(4)(A)(i)(I). The CFAA defines "loss" as follows:

[T]he term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

18 U.S.C. § 1030(e)(11). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8).

■ The Court finds that M–I fails to plead loss as it is defined in the CCPA. They have not alleged that any loss meets

---

4. The other factors involve medical care, physical injury, public health and safety, and damage affecting a government computer, none of which are alleged here. *See* 18 U.S.C. § 1030(c)(4)(A)(i)(II)-(V).

the statutory monetary sum of $5,000. In addition, case law has consistently interpreted the loss provision to encompass only the costs incurred as a result of investigating or remedying damage to a computer, or costs incurred because the computer's service was interrupted. *See, e.g., Nexans Wires S.A. v. Sark–USA, Inc.,* 319 F.Supp.2d 468, 475 (S.D.N.Y.2004), *aff'd,* 166 Fed.Appx. 559, 562–62 (2d Cir.2006). M–I simply alleges damages "to its business in the form of lost profits, loss of customers and loss of future business opportunities." (Doc. No. 355, ¶ 82.) M–I asserts no damages whatsoever relating to their investigation of computer damage, or costs incurred because any computer service was interrupted.

In sum, M–I's CCPA claim fails because M–I does not allege any facts showing at least $5,000 of loss, or any loss as a result of investigation or interruption of computer service. M–I's current CCPA pleadings thus run afoul of Rule 12(b)(6) requirements, because they do not put forth facts that allow the Court to make an inference that Defendants are liable for any misconduct under the CCPA. *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). The Court affords M–I one opportunity to replead this claim.

## III. MOTION FOR SUMMARY JUDGMENT

Defendants Knobloch and WES move for partial summary judgment on two grounds. First, they argue that M–I's tort claims based on wrongful copying of tool designs are preempted by federal copyright law. Second, they argue that Knobloch's covenants not to compete are unenforceable as a matter of law. (Defs. Benton T. Knobloch & Wellbore Energy Solutions, LLC's Mot. for Partial Summ. J. as a Matter of Law, Doc. No. 181, at 1.)

### A. Legal Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir.2000). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* The Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151, 120 S.Ct. 2097. Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed.R.Civ.P. 56(e)(1); *see also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## B. Analysis

### 1. Copyright preemption

 Knobloch and WES move to dismiss "M–I's tort claims based on wrongful copying of tool designs because the claims are preempted" by the U.S. Copyright Act, 17 U.S.C. §§ 101–1332. (Doc. No. 181, ¶ 7.) Whether a federal statute preempts state law is a question of law for this Court. *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir.2010) (citing *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir.2001)).

 Section 301(a) of the Copyright Act "accomplishes the general federal policy of creating a uniform method for protecting and enforcing certain rights in intellectual property by preempting other claims." *Daboub v. Gibbons*, 42 F.3d 285, 288 (5th Cir.1995). It provides:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). The Fifth Circuit has established a two-part test to determine whether a state law claim is preempted. First, the cause of action is "examined to determine whether it falls 'within the subject matter of copyright.'" *Daboub*, 42 F.3d at 289. Second, the cause of action is "examined to determine if it protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106." *Id.* (cita-

tions omitted). Section 106, for its part, grants the "exclusive right to reproduce, distribute, perform, and display the copyrighted work" to the holder of a copyright. *Id.*

 The first step requires the Court to determine whether the claim falls within the subject matter of copyright. Knobloch and WES argue that this case's "implication of the copyright laws relates to the drawings, designs, technical manuals, specifications and plans of M–I's tools which M–I alleges it owns and Defendants copied." (Doc. No. 181, ¶ 12.) They urge that those items fall within the subject matter of copyright. M–I does not dispute that its tool drawings and other material are copyrightable, but instead argues that the claims in this suit are based on "replicating *tools* using trade secret information, not copying copyright-protected drawings." (Pl. M–I LLC's Request for Relief & Resp. to Defs. Benton Knobloch & Wellbore Energy Solutions, LLC's Mot. for Partial Summ. J. as a Matter of Law, Doc. No. 195, ¶ 7) (emphasis in original). Focusing on tool copying rather than tool drawing copying is important, M–I argues, because tools are useful articles that do not qualify for copyright protection under the Copyright Act.

Neither party, however, disputes the other's argument regarding what is copyrightable matter. That is, M–I does not dispute that its drawings, designs, technical manuals, specifications, and plans fall under the subject matter of copyright. The Court agrees. Section 102 of the Copyright Act extends copyright protection to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." It then provides a list of categories of works of au-

thorship that includes "pictorial, graphic, and sculptural works." 17 U.S.C. § 102. Section 101, in turn, defines a "pictorial, graphic, and sculptural work" to include "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans." Several courts have found that technical drawings and designs fall within the subject matter of copyright. *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1490, 1501 (5th Cir.1990) (affirming opinion that treats engineering drawings as within the subject matter of copyright); *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1320 (9th Cir.1986) (noting that blueprints, engineering drawings, and architectural designs are all capable of copyright); *Jedson Eng'g, Inc. v. Spirit Constr. Servs., Inc.*, 720 F.Supp.2d 904, 910–19, 2010 WL 2541619, at *1–8 (S.D.Ohio June 18, 2010) (treating drawings of tissue manufacturing plant design and construction as copyrightable material); *Guillot–Vogt Assocs., Inc. v. Holly & Smith*, 848 F.Supp. 682, 686 (E.D.La.1994) (noting that both architectural and engineering drawings fall within the subject matter of copyright) (quoting *Schuchart & Assocs. v. Solo Serve Corp.*, 540 F.Supp. 928, 943 (W.D.Tex. 1982)). M–I's tool designs, drawings, and specifications fall within the subject matter of copyright.

Similarly, Knobloch and WES do not dispute that the tools themselves do not qualify for copyright protection. The definition of a pictorial, graphic, or sculptural work under the Copyright Act is subject to a "useful article" exception:

[T]he design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of ex-

isting independently of, the utilitarian aspects of the article.

17 U.S.C. § 101. A "useful article" is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." *Id.* M–I asserts, and Knobloch and WES do not dispute, that the tools in question are useful articles whose aesthetic elements, if any, cannot be identified separately from, and exist independently of, the utilitarian aspects of the tool.

Given that the parties agree that the drawings of the tools are subject to copyright, but the tools themselves are not, the question for this Court to decide is whether the claim in question concerns the drawings or tools. After a review of the Second Amended Complaint (Doc. No. 355), the live pleading in this case, the Court concludes that M–I's claims relate to tool drawings and similar information, and thus fall within the scope of copyright. In the relevant counts, M–I focuses on the theft of tool drawings and other information. M–I asserts, for example, that Knobloch, Stelly, and Squyres "received access to M–I's tool design and technology, and drawings and specifications, especially the SPS and GCS tools which were acquired by M–I in 2006" (Doc. No. 355, ¶ 47); that "M–I's tool designs and technology are proprietary information used by M–I in its business" (*id.* ¶ 49); that "Defendants have unlawfully obtained, used, and taken M–I's Confidential Information in violation of agreements and Texas law" (*id.* ¶ 69); and that "Defendants have taken and/or used, without permission, information and other property from M–I" (*id.* ¶ 84). Taken as a whole, the gravamen of M–I's complaint focuses almost exclusively on Stelly, Squyres, and Knobloch's alleged theft of tool drawings, designs, and other confidential information from WES. The Court finds that the claims fall under the subject matter of

copyright. The first prong of the test is met.

Next, the Court must consider whether the claim protects rights equivalent to any of the exclusive rights of a federal copyright. A state law claim protects rights equivalent to federal copyright claim where the core of the state law theory of recovery speaks to wrongful copying. *Daboub v. Gibbons*, 42 F.3d 285, 289 (5th Cir.1995). This examination requires a "comparison of the nature of the rights protected under federal copyright law with the nature of the state rights" asserted by a claimant. *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 (5th Cir.1999). It these two sets of rights are "determined to be 'equivalent,' then the state law cause of action is preempted." *Id.* A state-law created right is equivalent to copyright laws " 'if the mere act of reproduction, distribution, or display infringes it.' " *Recursion Software Inc. v. Interactive Intelligence, Inc.*, 425 F.Supp.2d 756, 764 (N.D.Tex.2006).

The Fifth Circuit "evaluate[s] the equivalency of rights under what is commonly referred to as the 'extra element' test." *Alcatel*, 166 F.3d at 772. Under this test, if the acts of Defendants about which M–I complains would violate both the state law cause of action and copyright law, then the state right is considered equivalent to copyright. *Id.* "If, however, one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie 'within the general scope of copyright,' and preemption does not occur." *Id.*

WES and Knobloch assert that M–I's state tort claims are equivalent to copyright claims. The claims include common law misappropriation of trade secrets, tortious interference with M–I's customer contracts, tortious interference with prospective business relations, tortious interference with M–I's employment contract, breach of fiduciary duty, violations of the Texas Theft Liability Act, conspiracy, unfair competition by misappropriation, and conversion.

WES and Knobloch argue that the "core theory" of M–I's state law tort claims is that Defendants wrongfully copied M–I's tool designs through its drawings, designs, technical manuals, specifications, and plans. Knobloch and WES assert that M–I has stated throughout this case, including in answers to interrogatories and in hearings before the Court, that WES has copied its engineering drawings, specifications, and technical units. M–I argues that its state tort claims are not equivalent to copyright law claims, because each cause of action "requires at least one additional element not found in copyright law." (Doc. No. 195, ¶ 10.) Specifically, M–I asserts that its claims of trade secrets and technology misappropriation includes the additional elements of (a) use of MI's trade secrets to create competing tools, (b) in direct violation of their contractual obligations and fiduciary duty to M–I. M–I believes that its allegations that certain defendants downloaded confidential information and took it to a new company is simply a prologue to its main allegation of the Defendants' wrongful *use* of the misappropriated documents. Knobloch and WES counter that M–I has drawn a distinction without a difference, arguing that to "make a tool from a design is to reproduce the design," because the design itself must be copied in order to be used. (Defs. Benton T. Knobloch & Wellbore Energy Solutions, LLC's Reply to Pl. M–I LLC's Resp. to Defs.' Mot. for Partial Summ. J. as a Matter of Law, Doc. No. 211, ¶ 4.)

The Court does not believe that the element of *use* of the copyrighted drawings to make tools constitutes qualitatively different behavior from the elements

for an action under copyright law. M–I cites *G.S. Rasmussen & Associates Inc. v. Kalitta Flying Services* in support of its argument. In that case, the plaintiff had obtained a certificate from the government to show the airworthiness of his aircraft design. He later offered to license it to defendant so they could use the same design for their own aircraft. Defendant declined to license the certificate from plaintiff, and instead copied plaintiff's flight manual and used it to obtain its own airworthiness certificate. Plaintiff then sued defendant for conversion and unjust enrichment, and defendant argued that copyright law preempted these state claims. The court disagreed, stating:

> Were [plaintiff] claiming an exclusive right to copy the manual, the drawings and plans or the [certificate] itself, his claim would surely be preempted by the Copyright Act. [Plaintiff] claims a much different interest, however: The right to *use* the [certificate] as a basis for obtaining an airworthiness certificate for an airplane that is modified in a particular way. [Plaintiff] thus complains not about the actual copying of the documents, but of their use as a shortcut in obtaining a valuable government privilege—the right to modify an airplane in a particular way without going to the trouble and expense of proving that the modification meets FAA standards.

958 F.2d 896, 904 (9th Cir.1992). The plaintiff in that case was not complaining about the actual copying of its drawings, but instead an unlikely use of that copied material: obtaining a valuable government privilege. The Court finds the case inapposite to the facts presented here. In the instant case, downloading the drawings alone *does* constitute the misappropriation, because M–I owns the exclusive rights to its technical drawings. The Court believes that this case is much closer to *Gemcraft Homes*, discussed above, than *Rasmussen.* There, the defendants stole architectural plans, which fall within the subject matter of copyright, and used them to make a building, which the court found to be uncopyrightable. Despite the fact that the plaintiff also alleged use of the plans, the court found that plaintiff had framed its state claims so that the mere act of copying the plans constituted the violation. 688 F.Supp. at 295. The Court believes M–I has done the same thing here. Defendants alleged downloading, copying, or transferring of work files constitutes unauthorized copying, and thus falls under federal copyright laws. Many other cases that have found federal copyright preemption did so in the context of *use* of the products. In other cases, both the copying and the use of the product were bound up in the very same act—for example, recording and releasing a non-original song without authorization. *See, e.g., Daboub v. Gibbons*, 42 F.3d 285, 287 (5th Cir.1995). The Court is not convinced that WES's alleged use of M–I's tool drawings supplies a qualitatively different element under the Fifth Circuit's extra element test.

Based on its review of the case law discussing federal copyright preemption, the Court concludes that some of M–I's state tort claims are equivalent to federal copyright legal rights, and are therefore at least partially preempted. At least some of the claims, at their core, allege that Defendants copied and used tool designs, technologies, drawings, and specifications. The Court believes that the tort elements for some of M–I's claims do not include qualitatively different elements than the elements for an action under the Copyright Act. The narrative that M–I has invariably constructed for this Court recounts the story of M–I's former employees downloading and taking with them tool drawings, which WES then used to create, manufacture, and sell tools. Indeed, the overarching theme of the allega-

tions contained in the complaint is one of the theft of M–I's tool drawings.

In that way, this case is similar to *Gemcraft Homes v. Sumurdy.* In that case, the court analyzed a similar preemption question and determined that copyright law preempted plaintiff's conversion and tortious interference claims. There, two of the plaintiff's employees left their employment as sales counselors to start a new company. They had previously entered into employment agreements with the employer, promising that they would not take or use plaintiff's documents. Plaintiff sued its former employees, accusing them of stealing, copying, and plagiarizing building plans, and using them to build " 'identically virtual' " floor plans. 688 F.Supp. 289, 291 (E.D.Tex.1988). The court found that plaintiff's conversion claim was preempted by copyright law, because as plaintiff had framed its conversion claim, the mere act of copying the architectural plans would infringe the state law right. *Id.* at 295. As to plaintiff's tortious interference claim, the court found it preempted to the extent that the claim complained that plaintiff had "lost benefits flowing from its exclusive rights to the architectural plans." *Id.*

The Court finds instructive *"Gemcraft Homes"* facts and reasoning. Given that the basis of liability for many of M–I's state tort claims is the theft of its trade drawings, and little else, the Court finds them to be preempted. The Court now turns to M–I's individual tort claims to determine whether the rights therein are equivalent to, and thus preempted by, federal copyright law.

### a. Common law misappropriation of trade secrets

■ Count 3 of the Second Amended Complaint accuses Knobloch, WES, Stelly, and Squyres of common law misappropriation of trade secrets. "To prevail on a misappropriation claim under Texas law, 'a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff' " *CQ, Inc. v. TXU Mining Co.,* 565 F.3d 268, 273 (5th Cir.2009) (quoting *Gaia Techs. Inc. v. Recycled Prods. Corp.,* 175 F.3d 365, 376 (5th Cir.1999)). By contrast, to establish a claim for copyright infringement, " 'a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.' " *Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 251 (5th Cir.2010) (quoting *Positive Black Talk Inc. v. Cash Money Records Inc.,* 394 F.3d 357, 367 (5th Cir. 2004)).

■ Texas's misappropriation claim is typical of trade secrets claims nationwide, which " 'often are grounded upon a defendant's breach of duty of trust or confidence to the plaintiff through improper disclosure of confidential material.' " *Stromback v. New Line Cinema,* 384 F.3d 283, 303 (6th Cir.2004) (quoting *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693, 717 (2d Cir.1992)). M–I has properly pled the breach of a confidential relationship or improper discovery. (*See* Doc. No. 355, ¶ 43 ("Stelly and Squyres had a confidential relationship with M–I which gave rise to certain fiduciary obligations."); *id.* ¶ 24 (noting that Knobloch maintained a Confidentiality Agreement with SPS/GCS).)

The Court concludes that the additional element in trade secret misappropriation, which requires either a breach of confidential relationship or discovery by improper means, "regulates conduct qualitatively different from that regulated by federal copyright law." *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.,* 170 F.3d 1354, 1365 (4th Cir.1999).

The Court is guided to this conclusion by Fifth Circuit case law, as well as its own prior decisions. In *Computer Management Assistance Co. v. Robert F. DeCastro, Inc.*, the plaintiff filed suit against defendants, alleging copyright infringement, trade secret misappropriation, unfair and deceptive trade practices and breach of contract. Defendants alleged that the unfair trade practices claim was preempted by federal copyright law. The Fifth Circuit dismissed the defendants' argument, holding that, "[b]ecause a cause of action under the Louisiana Unfair Trade Practices Act requires proof of fraud, misrepresentation or other unethical conduct, we find that the relief it provides is not 'equivalent' to that provided in the Copyright Act and, thus, it is not preempted." 220 F.3d 396, 404–05 (5th Cir.2000). The element in question here is not fraud or misrepresentation, but instead the breach of a confidential relationship. The Court finds, nonetheless, that breach of a confidential relationship provides the same kind of additional element as fraud or misrepresentation. Both elements introduce a layer of unfair competitive conduct that is qualitatively different from the simple unauthorized copying addressed by federal copyright law. *See* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1][h] ("Actions for disclosure and exploitation of trade secrets require a status of secrecy, not required for copyright, and hence, are not preempted.")

This Court's own precedent also establishes that the breach of a confidential relationship provides the necessary additional element that makes a state tort claim qualitatively different from a federal copyright claim. *See, e.g., Baisden v. I'm Ready Prod., Inc.*, 2008 WL 2118170, at *9 (S.D.Tex. May 16, 2008) ("Although plaintiff argues that his unfair competition claim seeks to vindicate [defendants'] unlawful attempts to obtain access and derive profits from his current and prospective business relationships, he has neither alleged in his complaint that [defendants] breached a confidential relationship or otherwise engaged in fraudulent or unethical conduct, nor argued that proof of his state law claim for unfair competition requires proof of an additional element not required to prove his federal copyright claim."); *Keane v. Fox Television Stations, Inc.*, 297 F.Supp.2d 921, 945 (S.D.Tex.2004) ("The way that [Plaintiff] claims to have disseminated his idea defeats his ability to circumvent federal copyright preemption because he cannot establish that his idea was conveyed in confidence as part of a commercial relationship...."). Courts nationwide have reached the same conclusion. *See, e.g., Stromback v. New Line Cinema*, 384 F.3d 283, 303–04 (6th Cir.2004) (noting that "a considerable number of cases have held that misappropriation of trade secrets claims are not preempted because they require proof of a confidential relationship, which provides the extra element required to survive preemption," and holding the same); *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 218 (3d Cir.2002) ("[I]f an employee of [plaintiff] who, by virtue of a confidential position, had access to the source code, misappropriated it, and used it to promote his own interests, such breach of confidentiality would be the extra element to a copyright infringement claim. The claim, therefore, would not be preempted by the act.") (citations omitted); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549 (11th Cir.1996) ("As a general matter, state law trade secret statutes have been deemed not to be preempted because the plaintiff must prove the existence and breach of a confidential relationship in order to prevail.... We have no doubt that the Florida trade secret statute at issue satisfies the 'extra element' test generally employed by courts in performing copyright preemption analysis."); *Data Gen. Corp. v. Grumman Systems Support Corp.*, 36

F.3d 1147, 1165 (1st Cir.1994) ("[Trade secrets] claims are not preempted because participation in the breach of a duty of confidentiality—an element that forms no part of a copyright infringement claim—represents unfair competitive conduct qualitatively different from mere unauthorized copying."), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick,* —— U.S. ——, 130 S.Ct. 1237, 176 L.Ed.2d 17 (2010); *Trandes Corp. v. Guy F. Atkinson,* 996 F.2d 655, 660 (4th Cir.1993) ("It is the employment of improper means to procure the trade secret, rather than the mere copying or use, which is the basis of [liability] .... Because [plaintiff's] clam for trade secret misappropriation requires proof of a breach of trust or confidence, [copyright law] does not preempt the claim."); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 848 (10th Cir.1993) ("Because [plaintiff's] claim for trade secret misappropriation under the Colorado Uniform Trade Secrets Act requires proof of a breach of trust or confidence—proof that is not required under the Copyright Act—[plaintiff's] state law claims are not preempted by federal law."); *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 717 (2d Cir.1992) ("The defendant's breach of duty is the gravamen of ... trade secret claims, and supplies the "extra element" that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying."); *S.O.S., Inc. v. Payday,* 886 F.2d 1081, 1090 n. 13 (9th Cir.1989) ("Since the California [trade secrets] statute pleaded in this case does not involve a legal or equitable right equivalent to an exclusive right of a copyright owner under the Copyright Act, but only prohibits certain means of obtaining confidential information, its application here would not conflict with federal copyright law.") (citations omitted).

 WES and Knobloch's citations to the contrary do not sway this Court's opinion. First, WES and Knobloch do not analyze each state tort claim element by element, but instead aver generally that the "core theory" of *all* of M–I's state tort claims is that Defendants committed wrongful copying. Defendants fail to proffer any argument regarding the confidential relationship element discussed above. Second, Defendants' citations to case law refer the Court to cases that either do not actually decide the question of preemption of a trade secrets claim, *see Ultraflo Corp. v. Pelican Tank Parts, Inc.,* 2008 WL 5141029, at *5 (S.D.Tex. Dec. 8, 2008) (noting that "[d]efendants presumably could have made ... arguments for complete preemption under the Copyright Act," but concluding that "[w]hether those arguments would have been persuasive ... need ... not be decided," because defendants failed to remove the case properly to federal court), do not consider trade secrets claims, *Daboub v. Gibbons,* 42 F.3d 285, 289 (5th Cir.1995), or, the Court respectfully submits, fail to undertake the proper inquiry in their equivalency analysis, *Butler v. Continental Airlines,* 31 S.W.3d 642, 651 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *Microsource v. Superior Signs, Inc.,* 1998 WL 119537, at *2 (N.D.Tex. Mar. 9, 1998).[5]

---

**5.** Both *Butler* and *Microsource* focus on the conduct alleged to support a misappropriation of trade secrets claim, rather than the elements required to prove the claim. However, "[t]o determine whether a particular cause of action involves rights equivalent to those set forth in [Section] 106, the elements of the causes of action should be compared, not the facts pled to prove them." *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 659 (4th Cir.1993). Where the "state law claim itself furnishes the extra element needed to avoid equivalency, a court should compare the elements of the state claim and copyright claim." *Stromback v. New Line Cinema,* 384 F.3d 283, 304 (6th Cir.2004). "Whether

Therefore, the Court sees no need to disturb the balance of case law, which holds that the breach of a confidential relationship establishes an element that is qualitatively different from a copyright infringement claim. M–I's misappropriation of trade secrets claim survives preemption.

### b. Tortious interference with M–I's customer contracts

■■■ Count Four of the Second Amended Complaint alleges tortious interference with M–I's customer contracts. "Texas law protects existing contracts from interference by third parties." *Specialties of Mex. Inc. v. Masterfoods USA*, 2010 WL 2488031, at *9 (S.D.Tex. June 14, 2010). A plaintiff must establish the following elements to succeed on a tortious interference with contract claim: (1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss. *Id.* (citing *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex.App.-Forth Worth 2009, pet. denied)). As stated above, copyright infringement requires copyright ownership and copying. The two claims appear to target very different conduct. Nevertheless, many courts find tortious interference claims to be preempted where the defendant has allegedly destroyed the exclusive right of a plaintiff to exercise and enjoy the benefits of a copyrighted work. In a widely cited case, the Second Circuit held that a plaintiff's claim for tortious interference was preempted where it was based on the unauthorized publication of a work that was protected by the Copyright Act. It noted:

> In both cases, it is the act of unauthorized publication which causes the violation. The enjoyment of benefits from derivative use is so intimately bound up with the right itself that it could not possibly be deemed a separate element. *See* 1 *Nimmer on Copyright* § 1.01[B], at n. 46 (1983). As the trial court noted, the fact that cross-appellants pleaded additional elements of awareness and intentional interference, not part of a copyright infringement claim, goes merely to the scope of the right; it does not establish qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated.

*Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (1983) *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Since that decision, many courts considering the same question have held that a tortious interference claim does not require an extra element that establishes qualitatively different conduct than that of copyright infringement. Instead, the additional intent elements required in tortious interference claims go "merely to the scope of the right," and do not "change the *nature* of the action." *Warren Sign Co. v. Piros*

---

the plaintiff has actually alleged the proper elements of the claim goes to the question of whether the claim could survive a Rule 12(b)(6) motion to dismiss, not whether the claim is preempted." *Id.* (citations omitted). Nonetheless, in some cases, a court may be required to review the facts pled by a plaintiff "in order to determine whether the acts giving rise to the state law claim are merely acts of copyright infringement." *Id.* (citations omitted). A conversion claim, for example, will survive where the plaintiff pleads conversion of tangible physical property. *See Carson v. Dynegy*, 344 F.3d 446, 456–57 (5th Cir.2003). Where plaintiff has pled only the unlawful retention of its intellectual property rights, however, a conversion claim will be preempted by federal copyright law. *Id.* In its analysis, the Court has focused its inquiry on whether the elements of a state cause of action incorporate requirements beyond those necessary to prove copyright infringement, unless case law for a specific tort claim directs the Court to do otherwise.

*Signs, Inc.*, 2010 WL 2802023, at *3 (E.D.Mo. July 15, 2010); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164–65 (1st Cir.1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, — U.S. —, 130 S.Ct. 1237, 176 L.Ed.2d 17 (2010); *Progressive Corp. v. Integon P & C Corp.*, 1991 WL 218010, at *6 (4th Cir. Oct. 29, 1991); *Tegg Corp. v. Beckstrom Elec. Co.*, 650 F.Supp.2d 413, 431 (W.D.Pa.2008); *Huckshold v. HSSL, LLC*, 344 F.Supp.2d 1203, 1208 (E.D.Mo.2004) (noting that awareness or intent do not constitute extra elements that make a state law claim qualitatively different form a copyright infringement claim, but instead limit the scope of the copyright infringement claim without altering its fundamental nature); *Gemcraft Homes, Inc. v. Sumurdy*, 688 F.Supp. 289, 295 (E.D.Tex.1988) (preempting plaintiff's tortious interference claim and noting that "[t]he fact that intentional interference with contract requires elements of knowledge of the existing contract and intentional interference with the contract, in addition to copying the plans merely means that the tortious interference claim is narrower than a copyright infringement claim") (citations omitted).

■ Based on this case law, the Court holds that, to the extent M–I's tortious interference claims are based on M–I losing benefits flowing from its exclusive right to tool drawings, designs, and other copyrightable material, its claims are preempted. To the extent the tortious interference claims relate to other than the benefits lost from exclusive enjoyment of tool drawings and other copyrightable material, however, they are not preempted.[6]

The Court does not believe that the presence of a confidential relationship is material to M–I's tortious interference claims. A breach of duty or trust does not constitute a necessary element for tortious interference, and courts have found such claims to be preempted in the context of theft of trade secrets. *Huckshold v. HSSL, LLC*, 344 F.Supp.2d 1203, 1208–10 (E.D.Mo.2004) (preempting tortious interference claim but not misappropriation of trade secrets claim). The Court follows suit, and finds M–I's claims to be preempted as to copyrightable trade secrets.

### c. Tortious interference with prospective business relations

■ Count Five alleges that Defendants tortiously interfered with M–I's prospective business relations. In addition to protecting existing contracts from interference, "Texas law also protects contracts that are not yet formed, but have a reasonable probability of being formed, from wrongful interference." In order to establish tortious interference with prospective business relations, a plaintiff must prove: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of

---

**6.** The Court is unclear on the basis for M–I's tortious interference claims. If they relate to any matters other than M–I's right to the tool drawings and other copyrightable material, they are not preempted. For example, Count Five alleges that Defendants used both the knowledge and position of M–I's former employees, *as well as* the trade secret information, to encourage clients to divert their business to WES. Matters falling within the "knowledge and position" of former M–I employees, for example, contacting former customers to solicit their business, would not fall within copyright law preemption. Neither would the theft and use of confidential information that is not subject to copyright.

the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Specialties of Mex. Inc. v. Masterfoods USA,* 2010 WL 2488031, at *10 (S.D.Tex. June 14, 2010) (citing *Smith v. Royal Seating, Ltd.,* 2009 WL 3682644, *3 (Tex.App.-Austin Nov. 6, 2009)). The Court sees no reason to deviate from its analysis regarding M–I's tortious interference with contracts claim. The independent unlawful act, from the Court's reading of the complaint, is the unlawful copying of M–I's original tool drawings and designs. Count Five is preempted to the extent it is based on M–I losing prospective business that would otherwise flow from its exclusive use of tool drawings, designs, and other copyrightable material. To the extent the claim relates to other than the prospective business lost from exclusive enjoyment of tool drawings and other copyrightable material, however, it is not preempted.

### d. Tortious interference with M–I's employment contracts

■ Count Six accuses Knobloch, WES, and Squyres of tortiously interfering with M–I's employment contracts. The elements of tortious interference with contract are outlined *supra* Part III(B)(1)(b). The Court holds that Count Six is preempted to the extent it alleges that Defendants induced one another, and Stelly, to steal, copy, download, or otherwise reproduce M–I's tool drawings, designs, and other copyrightable material. The Court finds that this claim fails the extra element test and thus is preempted. All other allegations under this cause of action survive.

### e. Breach of fiduciary duty

■ Count Seven asserts breach of fiduciary duty claims against Stelly, Squyres, and Knobloch. The Fifth Circuit is clear that such a claim survives copyright preemption. *See Daboub v. Gibbons,* 42 F.3d 285, 290–91 (5th Cir.1995) (finding copyright preemption where plaintiff "failed to allege or produce evidence of 'any element, such as an invasion of personal rights or a breach of fiduciary duty, which render [their claims] different in kind from copyright infringement.'") (quoting *P.I.T.S. Films v. Laconis,* 588 F.Supp. 1383 (E.D.Mich.1984)); *see also Randolph v. Dimension Films,* 630 F.Supp.2d 741, 750 (S.D.Tex.2009) ("However, if the plaintiff has alleged facts corresponding to an 'extra element,' such as a breach of fiduciary duty that would render his claims 'different in kind from a copyright infringement claim,' then his state law claims are not preempted.") (quoting *Sefton v. Jew,* 201 F.Supp.2d 730, 745 (W.D.Tex.2001)). M–I's breach of fiduciary duty claim survives.

### f. Texas Theft Liability Act

■ Count Eight alleges violations under the Texas Theft Liability Act, Tex. Civ. Prac. & Rem.Code Ann. §§ 134.001–134.005 (Vernon 2005). Under the Texas Theft Liability Act, "[a] person who commits theft is liable for the damages resulting from the theft." *Id.* § 134.003. Theft, in turn, is defined as "unlawfully appropriating property or unlawfully obtaining services as described by" certain sections of the Texas Penal Code. *Id.* § 134.002(2). M–I asserts theft under Section 31.05 of the Penal Code, which states that a "person commits an offense if, without the owner's effective consent, he knowingly: (1) steals a trade secret; (2) makes a copy of an article representing a trade secret; or (3) communicates or transmits a trade secret." Tex. Penal Code Ann. § 31.05 (Vernon 2003). The only potential extra element in theft liability is the "knowingly" requirement; however, as discussed *supra* Part III(B)(1)(b), elements of knowledge do not establish an element that is qualitatively different from a copyright infringe-

ment claim. Therefore, the Court finds that Count Eight is preempted as to the theft of trade secrets that fall within the subject matter of copyright. It is not preempted as to materials not falling within the subject matter of copyright.

### g. Conspiracy

■■■■ Count Nine alleges civil conspiracy against all Defendants. The elements of civil conspiracy in Texas are: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Finserv Cas. Corp. v. Settlement Funding, LLC,* 724 F.Supp.2d 662, 674–76, 2010 WL 2757536, at *10 (S.D.Tex. July 13, 2010) (citing *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 675 (Tex.1998)). Much like the tortious interference claims, the conspiracy claim requires an element of knowledge and planning, but fails to add any qualitatively different conduct to the claim. *Warren Sign Co., Inc. v. Piros Signs, Inc.,* 2010 WL 2802023, at *4 (E.D.Mo. July 15, 2010) (" 'Because copyright law already recognizes the concepts of contributory infringement and vicarious copyright infringement concepts, which extend joint and several liability to those who participate in the copyright infringement, a civil conspiracy claim does not add substantively to the underlying federal copyright claim and should therefore be preempted.' ") (quoting *Irwin v. ZDF Enterprises GmbH,* 2006 WL 374960, at *4 (S.D.N.Y. Feb. 16, 2006)). This Court, like others, concludes that the intent element of the conspiracy claim does not constitute qualitatively dif-

ferent conduct where the element of intent only goes to an intent to form an agreement to copy and use M–I's copyrightable trade secrets and confidential information. *See Tegg Corp. v. Beckstrom Elec. Co.,* 650 F.Supp.2d 413, 427 (W.D.Pa.2008). To the extent the alleged conspiracy speaks to an agreement other than to steal M–I's copyrightable material, however, it is not preempted.[7]

### h. Unfair competition by misappropriation

■■■■ Count Ten brings an unfair competition by misappropriation claim against all Defendants. The elements of unfair competition by misappropriation are: (1) the creation by plaintiff of a product through extensive time, labor, skill, and money; (2) the use of that product by defendant in competition with plaintiff, thereby giving the defendant a special competitive advantage because he was burdened with little or none of the expense incurred by plaintiff in the creation of the product; and (3) commercial damage to plaintiff. *Cable Elecs., Inc. v. N. Am. Cable Equip., Inc.,* 2010 WL 1541504, at *3 (N.D.Tex.2010) (citing *Alcatel USA, Inc. v. DGI Techs.,* 166 F.3d 772, 788 (5th Cir. 1999)). "In contrast to federal copyright law, which focuses on the value of creativity, state misappropriation law is specifically designed to protect the *labor*—the so-called 'sweat equity'—that goes into creating a work." *Alcatel USA,* 166 F.3d 772, 788 (5th Cir.1999). Nevertheless, the Fifth Circuit has found that the rights protected under the laws can be equivalent. *Id.* In *Alcatel,* the basis of plaintiff's unfair competition by misappropriation claim was that defendant reproduced its firmware and other materials, used these

---

**7.** Again, it is unclear from M–I's conspiracy claim, as pled, what the object of the conspiracy is. So, for example, this Count is not preempted to the extent it claims that Defen-

dants conspired to steal non-copyrightable information, to solicit M–I's customers, or to commit other acts relating to materials other than M–I's copyrightable information.

materials to prepare derivative works, and distributed these works in competition with plaintiff. Defendant argued that plaintiff's unfair competition claim was preempted by copyright law. The Fifth Circuit agreed. 166 F.3d at 789. It found that the plaintiff had "failed to demonstrate the presence of any element that renders different in kind its rights under state and federal law." *Id.* Specifically, the *Alcatel* court found that neither the element requiring the investment of "extensive time, labor, skill, and money" nor the requirement that defendant use the product in competition with plaintiff established the necessary qualitatively different element. *Id.* This Court comes to the same conclusion, and finds M–I's unfair competition by misappropriation claim to be preempted by federal copyright law to the extent the claim is based on M–I's tool designs. From the Court's reading of M–I's complaint, Defendants' use of M–I's tool designs appears to form the bulk of this Count. Nevertheless, the claim survives to the extent M–I alleges that Defendants have engaged in unfair competition by misappropriation of non-copyrightable material.

### i. Conversion

M–I's last tort claim alleges that Defendants have committed conversion. The elements of conversion under Texas law are as follows: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused the plaintiff's demand for the return of the property. *City Bank v. Compass Bank,* 717 F.Supp.2d 599, 611–12, 2010 WL 1959808, at *10 (W.D.Tex. May 12, 2010) (citing *Huffmeyer v. Mann,* 49 S.W.3d 554, 558 (Tex.App.-Corpus Christi

2001, no pet.)). In *Carson v. Dynegy,* the Fifth Circuit explained that the elements of conversion of physical property are qualitatively different than those of copyright infringement where the allegations concern tangible property. Accordingly, it found that a state conversion claim, based on the conversion of a tangible worksheet, survived preemption. The Fifth Circuit cited with approval sources which noted that preemption does occur where the plaintiff alleges only the " 'unlawful retention of its intellectual property rights and not the unlawful retention of the tangible object embodying its work.' " 344 F.3d 446, 456–57 (5th Cir.2003) (quoting *Pritikin v. Liberation Publ'ns, Inc.,* 83 F.Supp.2d 920, 923 n. 1 (N.D.Ill.1999)). Here, the property allegedly converted by Defendants was intangible. M–I makes no allegation that Defendants converted tangible documents. The conversion claim is therefore preempted to the extent it covers tool drawings, designs, and other matter subject to copyright protection. It is not preempted as to non-copyrightable material.

### 2. Covenant not to compete enforceability

As its second basis for partial summary judgment, WES and Knobloch argue that the covenant not to compete in Knobloch's Confidentiality Agreement and Employment Agreement are unenforceable under Texas law. WES and Knobloch assert that the covenant not to compete in Knobloch's confidentiality agreement is invalid due to a lack of limitation on geographic area or scope of activity limitation. Next, they aver that a separate covenant, contained in Knobloch's employment agreement, is unenforceable because it operates as an industry-wide exclusion, is overbroad as to customer contact, and contains no reasonable geographic limitation. Finally, WES and Knobloch argue that the covenant not to compete in the employment

agreement is unenforceable on its own terms. M–I disputes each of these arguments.

▮▮▮▮ The Texas Business and Commerce Code governs the enforceability of covenants not to compete. It provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM.CODE § 15.50(a) (Vernon 2005). The law relating to covenants not to compete adopted the Texas common law in many respects. *John R. Ray & Sons, Inc. v. Stroman,* 923 S.W.2d 80, 84 (Tex. App.-Houston [14th Dist.] 1996, writ denied). This Court may therefore look to cases prior to the statute's enactment for guidance. *Id.* at 84–85. Whether a covenant not to compete is an unreasonable restraint of trade is a question of law for this Court. *Gallagher Healthcare Ins. Servs. v. Vogelsang,* 312 S.W.3d 640, 646–47 (Tex.App.-Houston [1st Dist.] 2009).

▮▮▮▮ Courts generally disfavor covenants not to compete "because of the public policy against restraints of trade and the hardships resulting from interference with a person's means of livelihood." *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 658 (Tex.App.-Dallas 1992, no writ) (citing *Martin v. Linen Sys. for Hosps., Inc.,* 671 S.W.2d 706, 706 (Tex.App.-Houston [1st Dist.] 1984, no writ)). "A covenant not to compete is a restraint of trade and unenforceable as a matter of public policy unless it meets a reasonableness standard." *Stroman,* 923 S.W.2d at 85 (citations omitted). Covenants not to compete are unreasonable if they are "broader than nec-

essary to protect the legitimate interests of the employer." *Stroman,* 923 S.W.2d at 85; *see also DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 681–82 (Tex.1990); *Henshaw v. Kroenecke,* 656 S.W.2d 416, 418 (Tex.1983).

Knobloch appears to have signed two covenants not to compete during his tenure with M–I. The first is contained in his Confidentiality Agreement, and the second in his Employment Agreement. WES and Knobloch ask this Court to find the Confidentiality Agreement's covenant to be unenforceable. The Court sees no need to take this action, however, because M–I has not sued Knobloch for violation of this covenant. Instead, M–I pleads:

> Knobloch has breached and continues to breach these contracts. Knobloch breached and continues to breach the contracts by using and disclosing SPS/GCS's Confidential Information. Further, Knobloch has breached the Employment Agreement by forming and operating WES, competing and soliciting SPS/GCS employees and customers within six months of his termination at M–I.

(Doc. No. 355, ¶ 88.) Upon its reading of M–I's pleading, the Court believes that M–I alleges only that Knobloch has breached the covenant not to compete located in the Employment Agreement. In its briefing, M–I affirms this, arguing that they have not plead a non-compete claim under the Confidentiality Agreement. (Doc. No. 195, at 29.) The Court accepts and binds M–I to this representation; it is therefore unnecessary to consider the enforceability of the Confidentiality Agreement's covenant not to compete.

▮▮▮ The Court now turns to the covenant not to compete located in the Employment Agreement. M–I's pleading, reproduced above, clearly brings a cause of

action for that covenant. The Employment Agreement provides:

*Noncompete; Working for Competitor:* In consideration of Employee's employment by Employer, the specialized training and access to confidential information promised by and given to Employee by Employer and other good and valuable consideration provided to Employee by Employer, Employee will not, at any time during the term of this Agreement or at any time for six (6) months subsequent to the termination of Employee's employment for any reason (except as provided in Section 5 upon termination without cause), directly or indirectly, individually or as an agent, employee, owner, manager, consultant or representative of any entity, in any geographic area where Employer does business or is authorized to do business:

a. solicit, influence or attempt to influence any Customer, Potential Customer, or supplier of Employer to stop doing business with Employer or to do business with any of Employer's competitors in the area of the Restricted Business. For purposes of this Section 8(a), "Customer" means any natural person or any entity that conducts business with Employer or has an account with Employer, and any parent, affiliates or subsidiaries of such persons or entities. Also, for purposes of this Section 8(a), "Potential Customer" means any natural person or any entity that might reasonably be expected to conduct business with Employer because Employer has, within the immediately prior six (6) month period, offered or presented its services to such persons or entities;

b. interfere with the relationship between Employer and any of Employer's affiliates, Customers, Potential Customers or suppliers;

c. engage in the Restricted Business with any of Employer's competitors. For purposes of this Agreement, "Restricted Business" shall mean any business or transaction involving oilfield displacement tools or services or any other businesses then conducted by Employer.

(Doc. No. 181, Ex. 2, at 6.) WES and Knobloch do not dispute that the covenant meets the first requirement under Texas law—that is, that the covenant was ancillary to or part of an otherwise enforceable agreement at the time it was made. Thus, the Court turns to the second requirement for covenants not to compete, and examines whether the covenant is reasonable and does not impose a greater restraint than is necessary to protect M–I's business interest.

Knobloch and WES advance three objections to Knobloch's covenant not to compete. First, they argue that the covenant imposes upon Knobloch an impermissible industry-wide work exclusion. The covenant not to compete prevents Knobloch from engaging in the "Restricted Business" with any of the employer's competitors. "Restricted Business" is defined as "any business or transaction involving oilfield displacement tools or services or any other businesses then conducted by" the employer. (Doc. No. 181, Ex. 2, at 6.) Defendants argue that, according to Texas law, a covenant not to compete containing an industry-wide exclusion from subsequent employment is unenforceable. (Doc. No. 181, ¶ 29.)

Second, Knobloch and WES argue that the covenant's restriction on soliciting "potential customers" is overly broad and unduly restrictive. They urge this Court that, because the clause is not limited to clients with whom Knobloch actually interacted, the covenant not to compete is unenforceable. (*Id.* ¶ 33.) The covenant not

to compete prevents Knobloch from soliciting customers and "potential customers," who are defined as natural persons or entities "that might reasonably be expected to conduct business with Employer because Employer has, within the immediately prior six (6) month period, offered or presented its services to such persons or entities." (Doc. No. 181, Ex. 2, at 6.)

Third, Knobloch and WES argue that the covenant is unenforceable because it contains no reasonable geographic limitation. The limitation in the covenant forbids Knobloch from competing in "any geographic area where Employer does business or is authorized to do business," which Defendants argue covers a broad area encompassing at least 300 locations in 75 countries. Given such an indefinite description of geographic restriction, Knobloch and WES urge this court to rule the covenant to be unenforceable.

M–I disputes each of these points. It asserts first that the relevant employer, as defined in the covenant, is SPS/GCS, not M–I. Next, M–I argues that the geographic and scope of activity limitations are reasonable given Knobloch's position as a high level employee. M–I urges the Court to take a holistic approach in assessing the reasonableness of the covenant not to compete by considering the combination of the time, geographic, and scope of activity limitations together, rather than apart. M–I insists that the covenant not to compete's geographical and scope of activity limitations should be viewed in light of the short six month duration of the entire covenant.

The Court considers M–I's first counterpoint—that the relevant employer is SPS/GCS, and not M–I—before moving to the merits of the covenant's enforceability. Defining the relevant employer is an important step, of course, because that definitively sets the geographic and scope of activity limitations.

The Employment Agreement, which contains the covenant not to compete at issue, defines "Global Completion Services, Inc." as the employer. (Doc. No. 181, Ex. 2, at 1.) M–I explains that Global Completion Services changed its name to SPS when it was acquired by M–I. (Doc. No. 195, ¶ 32.) M–I argues that the covenant not to compete relates to SPS/GCS business needs, rather than M–I's business needs. The Court agrees. "An assignee stands in the same position as the assignor, and may assert only those rights that the assignor had." *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 720 (Tex.App.-Houston [1st Dist.] 1988, writ denied). Texas courts have held that, when a business is sold and the covenant not to compete is assigned to the purchaser, the reasonable geographic restriction must be "no larger than to protect the business sold." *Williams v. Powell Elec. Mfg. Co.*, 508 S.W.2d 665, 668 (Tex.Civ.App.-Houston [14th Dist.] 1974, no writ) (citing *Barrett v. Curtis*, 407 S.W.2d 359 (Tex.Civ.App.-Dallas 1966, no writ)). Settled law confirms that contractual rights may not expand following an assignment. Knobloch's covenant not to compete is therefore interpreted by SPS/GCS business needs.

WES and Knobloch respond that, although M–I argues that the relevant employer is SPS/GCS, M–I is nevertheless seeking damages based on M–I's own lost profits, customers, and loss of future business opportunities. (Doc. No. 211, ¶ 13.) M–I's pleading does state damages in terms of M–I's lost money, employees, and opportunity. M–I is not, however, the proper benchmark for determining loss under the covenant not to compete. If M–I prevails on this claim, it must submit evidence showing the loss to SPS/GCS as a result of Knobloch's alleged breach. The Court will award damages only on this basis. To do otherwise, by granting M–I damages based on its total losses, would

reward M–I with damages beyond what it is entitled to receive in the covenant, and would impermissibly expand its rights.

The Court now turns to the three objections to the covenant advanced by WES and Knobloch. They argue that the covenant not to compete operates as an "industrywide exclusion," which they assert is impermissible under Texas case law. M–I argues that the covenant is not an industry-wide ban, but instead, applies only to well completion services. Thus, M–I insists, Knobloch "could have chosen to work in any of the multitude of other service sectors in the oil and gas industry." (Doc. No. 195, ¶ 50.) WES and Knobloch appear to concede as much in their reply, but argue that, nevertheless, "[t]o an individual … a global industry-wide prohibition for half a year, banning his ability to work in the oilfield displacement tools or services industry for six months, is not reasonable" because it imposes an undue hardship on an individual's livelihood. (Doc. No 211, ¶ 15.)

In support of their position, WES and Knobloch cite *John R. Ray & Sons, Inc. v. Stroman.* In that case, an employee was hired as an insurance agent by a family-owned insurance agency. Pursuant to his employment contract, the employee could not "engage in or have an interest in any business that sold insurance policies or engaged in the insurance agency business within [the county] and all adjacent counties" for a period of five years from the date of the contract. 923 S.W.2d 80, 83 (Tex.App.-Houston [14th Dist.] 1996, writ denied). It also provided that the employee would never solicit or accept business from any of the employer's accounts, either alone or as an employee for another company. Before the five-year term had ended, the employee left his employment and began working with another insurance agency in the same county. When the former employer chal-

lenged his actions, the employee filed suit, arguing that the covenant not to compete was unenforceable. The court agreed, holding that the employee's contract had created "an unenforceable industry-wide exclusion" by preventing him from working in the local insurance business. The *Stroman* court further found the contract unenforceable because the prohibition on customer solicitation was unlimited as to time, extended to customers with whom the employee had no association, and because the employer had not shown that the limitations were necessary to protect its goodwill or business interests. *Id.* at 85.

The combination of factors presented in *Stroman* convinces the Court that the case is readily distinguishable. First, as the *Stroman* court noted, the covenant not to compete in that case restricted the employee's ability to work in the insurance business altogether. By contrast, as WES and Knobloch concede, Knobloch's covenant not to compete does not bar him from working in the oil and gas industry altogether. As M–I notes, Knobloch could work in other service sectors within that industry, particularly given his engineering background.

Knobloch's situation strikes the Court as more similar to the employee in *Curtis v. Ziff Energy Grp.* In that case, the employee worked for employer as the Vice President of Pipelines and Energy Marketing. The relevant covenant not to compete in that case prohibited the employee from engaging in competitive business in Canada or the United States. In the ensuing litigation over the covenant's enforceability, the employee claimed that he was restricted from working for any oil and gas company in North America. The employer disagreed, and submitted evidence to show the court that it limited its competitors to twenty companies, which were comprised

of oil and gas consulting firms. 12 S.W.3d 114, 119 (Tex.App.-Houston [14th Dist.] 1999, no pet.). The Court sided with the employer, holding that, based on the employee's "job description and responsibilities, it was reasonable to restrict [him] from working in other oil and gas consulting firms in North America for a six month period." *Id.* (citing *Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 902 (Tex.Civ. App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.).)

According to Knobloch's covenant not to compete, he is prohibited from competing in the "Restricted Business," which is defined as "any business or transaction involving oilfield displacement tools or services or any other businesses then conducted by Employer." (Doc. No. 181, Ex. 2, at 6.) Though M–I, unlike the employer in *Curtis,* did not provide evidence of SPS/GCS's competitors in support of its argument that the covenant is not an industry-wide exclusion, the Court is satisfied that the plain language of the agreement does not create an industry-wide exclusion that encompasses all oil and gas, but instead restricts Knobloch from working for a competitor within the oil displacement tools or services industry. M–I asserts that SPS/GCS provided "niche" services to the oil and gas industry, and WES and Knobloch do not refute that characterization. Furthermore, although the definition of "Restricted Business" contains a catchall phrase that encompasses "any other business then conducted" by SPS/GCS, no allegation has been made that SPS/GCS operated businesses outside of well completion services. The Court finds that Knobloch's covenant not to compete does not impose an impermissible industry-wide exclusion, but instead, restricts his competition to a reasonably narrow business area that correlates to his work with SPS/GCS.

The Court now turns to Knobloch's and WES's argument that the covenant is unenforceable because it contains no reasonable geographic limitation. Texas courts generally require some geographic limitation in a valid covenant not to compete. *See, e.g., Goodin v. Jolliff,* 257 S.W.3d 341, 352 (Tex.App.-Forth Worth 2008, no pet.) (citing cases); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 660–61 (Tex.App.-Dallas 1992, no pet.) "A reasonable geographic scope is generally considered to be the territory in which the employee worked for the employer." *TransPerfect Translations, Inc. v. Leslie,* 594 F.Supp.2d 742, 754 (S.D.Tex.2009) (citing *Harthcock,* 824 S.W.2d at 660).

WES and Knobloch rely on *Goodin v. Jolliff* for their argument that the covenant should fail because it fails to set forth a reasonable geographic limitation. *Goodin* is inapposite. The covenant in that case failed to include "any limitation as to geographic scope whatsoever." 257 S.W.3d at 352. By contrast, Knobloch's covenant not to compete prevents him from competing "in any geographic area" where SPS/GCS does business or is authorized to do business. (Doc. No. 181, Ex. 2, at 6.) Though SPS/GCS's authorized or actual business areas are not further defined in the covenant, M–I has submitted evidence showing that SPS/GCS did business in North American, South American, and the Caribbean. As Manager of Sales for the Americas, Knobloch worked throughout this territory. He testified that his territory covered North America, the Caribbean, and parts of South America. (Knobloch Dep. 95:17–96:12.)

"[N]on-compete covenants with restrictions covering a wide geographic area may be reasonable if they are limited in scope to a firm's current or prospective clients such that they do not pose a greater restraint than necessary to protect the

firm's goodwill." *TransPerfect Translations, Inc. v. Leslie,* 594 F.Supp.2d 742, 754 (S.D.Tex.2009) (citing cases). Covenants with wide geographic areas have been upheld frequently in Texas courts, especially when the area covered constitutes the employee's actual sales or work territory. *See, e.g., Vais Arms, Inc. v. Vais,* 383 F.3d 287, 295 (5th Cir.2004). The Court acknowledges that a geographic area covering the Western hemisphere is broad, reaching to the outer limits of a restriction. However, the Court is satisfied that, given Knobloch's extensive job responsibilities, his position in upper management at SPS/GCS, and the fact that his actual territory did span the Americas, the geographic restriction contained in the covenant was reasonable to protect SPS/GCS's business interests. *See Curtis v. Ziff Energy Grp.,* 12 S.W.3d 114, 119 (Tex. App.-Houston [14th Dist.] 1999, no pet.).

Knobloch and WES's third and last objection to the covenant not to compete concerns the limits on Knobloch interacting with all customers and potential customers. They argue that such a restriction is overbroad and unreasonable.

The covenant provides that Knobloch may not solicit any customers or potential customers for a period of six months. A customer is defined as an entity that conducts business or has an account with SPS/GCS. A "potential customer" is defined as someone who "might reasonably be expected to conduct business" with SPS/GCS because SPS/GCS has, "within the immediately prior six (6) month period, offered or presented its services to such persons or entities." (Doc. No. 181, Ex. 2, at 6.) WES and Knobloch cite *Goodin v. Jolliff* for the proposition that restricting Knobloch from contacting all customers, including those with whom he had no contact, is unreasonable. WES and Knobloch also object to the covenant's requirement that Knobloch not "directly or *indirectly* " compete with

SPS/GCS. (Doc. No. 181, Ex. 2, at 6) (emphasis added). They argue that this language, similar to that found in *Goodin,* is also overbroad.

The Court addresses the second argument first. The pertinent part of the covenant in *Goodin* provided that the employees could not start a competing business, directly or indirectly, without "any limitation as to geographic scope whatsoever." 257 S.W.3d 341, 352 (Tex.App.-Forth Worth 2008, no pet.). In other words, it was the combination of factors, which prevented the employees in *Goodin* for a period of five years from competing indirectly with their former employer *without any geographic limitations,* played a significant role in that court's decision. The Court is not convinced that, if the "directly or indirectly" language had been combined with a reasonable geographic and time-period restriction, the court would have nevertheless struck down the covenant.

The Court finds more troubling Knobloch and WES's central argument in this objection—the restriction on contacting customers. The covenant's restriction on solicitation of all customers and potential customers, which surely covers clients with whom Knobloch had no contact. Texas courts have struck down such covenants as unenforceable. *TransPerfect Translations, Inc. v. Leslie,* 594 F.Supp.2d 742, 754 (S.D.Tex.2009) ("Texas courts note that non-compete covenants that ... prevent contact with clients with whom the employee had no contact are unenforceable."); *Peat Marwick Main v. Haass,* 818 S.W.2d 381, 386–87 (Tex.1991) (holding that an accounting firm's protectable interest was its client base, and that the non-solicitation provision, which inhibited departing partners from engaging accounting services for clients who were acquired after the employee left, or with whom the accountant had no contact while at the

firm, was overbroad and unreasonable). On the other hand, however, courts have also dispensed with one or more factors entirely when the totality of circumstances indicated that the covenant not to compete was reasonably narrow to protect a company's business interest or goodwill. So, for example, courts have held that covenants with no geographical limitation were reasonable and enforceable. *See, e.g., Traders Int'l, Ltd. v. Scheuermann*, 2006 WL 2521336, at *8 (S.D.Tex. Aug. 30, 2006) ("Although the Confidentiality and Invention Agreement does not specify a geographic limitation on the non-competition agreement, it is nonetheless enforceable. While there is a split of authority on this legal issue, the court is persuaded that where the employment agreement restricts the employee from contacting former customers with whom the employee dealt while employed by the employer, this is a reasonable substitute for a geographic limitation.") (internal citations omitted); *Totino v. Alexander & Assocs., Inc.*, 1998 WL 552818, at *3 (Tex.App.-Houston [1st Dist.] Aug. 20, 1998) (noting that the lack of an express geographic restriction is not per se unreasonable).

The Court agrees with M–I that the factors included in the covenant not to compete should be considered in combination with one another, rather than as stand alone requirements. Applying that approach, the Court cannot say that the ban on all customer and potential customer contacts is unreasonable to protect SPS/GCS's business interest. Three important factors bring the Court to this conclusion. First, the short six-month duration of the covenant not to compete imposes a limited burden on Knobloch. During that six-month period, Knobloch still had several options: he could have chosen to work outside the wellbore completion industry, to work in that industry but outside of the Americas, or not to work and launch a competing business six months later. The

Court is convinced that, given Knobloch's scientific background and in-depth knowledge of the industry, all of those options remained open to him when he left his employment with SPS/GCS.

The second factor is the upper management position held by Knobloch at SPS/GCS. M–I has submitted evidence showing that Knobloch was much more than a manager and salesman for his former employer. He oversaw SPS/GCS's relationships with major international clients. (Knobloch Dep. 85:15–86:25; Doc. No. 196, Exs. 25–27.) An engineer by training, Knobloch participated in the design of SPS/GCS's tools and in facilitating wellbore completions. He delivered technical presentations internationally, formulated company growth strategies, and discussed product development with engineers. (Doc. No. 196, Ex. 16.) Given Knobloch's high level of involvement in the company's growth and development, the Court believes that restricting him from contacting SPS/GCS's customer base was reasonable.

The third, and perhaps most important, factor goes to SPS/GCS's protectable interest. Texas courts are generally concerned about customer contract restrictions where the client base is the protectable business interest. *See, e.g., Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex.1991) (defining the business interest in that case to include preserving the firm's client base). M–I has made a strong case that the business interest in this case extends beyond SPS/GCS's client base, given Knobloch's intimate knowledge of tool designs and functionality. Knobloch had access to sensitive company information, including many trade secrets. The Court is convinced that the definable business interests in this case involve not just preserving a client base, but also maintaining trade secrets and other sensitive information. The restriction on all customer

contact is accordingly not an unreasonable restraint of trade as to this particular employee. *See Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 902 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.).

The Court declines to grant WES and Knobloch summary judgment on the covenant not to compete. The covenant not to compete is a reasonable restraint of trade, and is therefore enforceable.

## IV. DEFENDANTS' MOTION FOR PROTECTION

Defendants have filed a joint expedited motion for protection from discovery of their trade secret information. They argue that, under the burden shifting mechanism applied in Texas state courts, when a party seeking protection has established that the information sought is a trade secret, the party requesting the information must establish that the information is necessary for a fair adjudication of its claim or defense. (Defs.' Joint Expedited Mot. for Protection from Disc. of Proprietary Trade Secret Information, Doc. No. 300, ¶¶ 8–9.) Defendants assert that M–I has failed to make this critical showing, and thus is not entitled to discovery. (*Id.* ¶¶ 17–21.) They argue further that the depositions recently taken in Scotland of M–I engineers shows that M–I has little proof of its claims that Defendants have stolen its trade secrets. (*Id.* ¶¶ 1–6.) M–I counters that Defendants are flouting this Court's discovery orders, which have already provided that Defendants must produce trade secret information, and argue further that they have met their burden to show that the trade secrets are necessary for a fair adjudication of their claims. (M–I LLC's Resp. to Defs.' Joint Expedited Mot. for Protection from Disc. of Proprietary Trade Secret Information, Doc. No. 316, ¶¶ 5, 35–40.) M–I also argues that its engineers identified several suspected misappropriations of trade secrets. (*Id.* ¶¶ 8–28.)

Discovery in this case has been far from smooth. In November 2009, this Court ordered discovery to proceed along a certain schedule, due to the sensitive nature of the discoverable material. The Court divided discovery into two phases. The first phase was to include discovery of all matters "exclusive of trade secrets." (Disc. Hr'g Tr. 33, Nov. 24, 2009.) After the first phase, the Defendants would be allowed to depose certain M–I engineers in order to obtain more detail as to the trade secret theft at issue. Following the depositions, the case was to proceed to a second round of discovery where "trade secret information [would] be disclosed" pursuant to the agreed protective order in this case. (*Id.*) The Court subsequently issued a written order outlining the planned discovery schedule. (*See* Doc. No. 155.)

Despite M–I's protests that the first phase of discovery had not yet been completed, the Court ordered depositions of four key M–I employees to go forward in April 2010. The depositions of George Telfer, Mark Temple, Graeme Laws, and Dennis Hanks tool place in Scotland from April 5–7, 2010.

According to the discovery schedule, then, phase two discovery requiring trade secret disclosure should have begun after the Scotland depositions. Defendants, however, have adamantly objected to producing any of their trade secrets, and M–I has complained equally loudly that Defendants are circumventing this Court's orders by refusing to produce sensitive information. After adjudicating a large number of disputes in April and May, the Court stayed the case in order to decide the pending dispositive motions.

### A. Analysis

Defendants, in some ways, make a pitch for a question already decided. They seek protection under Texas Rule of Evidence 507 by arguing that M–I has failed to meet

its burden of showing that discovery of trade secrets is necessary in this case, as required under the case law that has developed around that rule.

Texas Rule of Evidence 507 protects discovery of trade secrets, allowing a person to refuse to disclose a trade secret under certain circumstances. The rule provides:

> A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the judge shall take such protective measures as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

The Texas Supreme Court has established a burden shifting mechanism by which evidence must be produced under Rule 507.

> First, the party resisting discovery must establish that the information is a trade secret. The burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its clams. If the requesting party meets this burden, the trial court should ordinarily compel disclosure of the information, subject to an appropriate protective order. In each circumstance, the trial court must weigh the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party.

*In re Continental Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex.1998).

 The Federal Rules of Civil Procedure also provide for the protection of trade secret information under certain circumstances. Rule 26(c)(1) provides:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending—or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken.... The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way...."

It is "well settled that there is no absolute privilege for trade secrets and similar confidential information." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2043 (2d ed.1994). Rather, federal courts follow a similar scheme in determining whether and how to order the disclosure of trade secrets or other confidential information. First, the party seeking protection must establish that the relevant information falls within the provision of this rule. *Id.* " '[T]he burden is upon [the party seeking the protective order] to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.' " *Sanchez v. Property & Cas.*, 2010 WL 107606, at *1 (S.D.Tex.2010) (quoting *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir.1998)). The party seeking protection " 'must first establish that the information sought is a trade secret or other confidential information and then demonstrate that its disclosure would cause an identifiable, significant harm.' " *Id.* (quoting *Stone Connection, Inc. v. Simpson*, 2008 WL 1927033, at *1 (E.D.Tex. Apr. 28, 2008)).

 If the party seeking protection establishes that the information sought is both confidential and that disclosure would cause harm, then the burden falls on the

opposing party to "establish that the information is sufficiently relevant and necessary" to its case to outweigh the harm that disclosure may cause. 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2043 (2d ed.1994). "'It is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure. Likewise, if the trade secrets are deemed relevant and necessary, the appropriate safeguards that should attend their disclosure by means of a protective order are also a matter within the trial court's discretion.'" *R.C. Olmstead, Inc. v. CU Interface, LLC,* 606 F.3d 262, 269 (6th Cir.2010) (quoting *Centurion Indus., Inc. v. Warren Steurer & Assocs.,* 665 F.2d 323, 326 (10th Cir.1981)).

The state and federal standards are very similar. Given its federal question jurisdiction over this case, the Court applies the Texas procedural rules here. As to Defendants' initial burden of proving that the matter is a trade secret, M–I does not dispute, and the Court does not doubt, that the materials in question qualify. Defendants' trade secrets include sensitive information such as tool drawings, engineering data, individual component sketches, pricing and inventory lists, certain communications with manufacturers, and more. (Doc. No. 300, ¶ 13.) Both parties have acknowledged from the outset of the case that such material qualifies as trade secrets. The Court agrees.

■ As discussed at length in this opinion, M–I brings several state law causes of action against Defendants in this suit. Their core allegation is that Defendants misappropriated their trade secrets. M–I has stated a claim for misappropriation of trade secrets, and now seeks discovery in order to support those claims with evidence. Importantly, trade secrets are the *subject* of this litigation. M–I is not seeking WES's trade secrets so it may use the information to prove a tangential or connected point. Rather, the trade secrets are sought because M–I alleges that the trade secrets themselves were stolen, and needs evidence to bolster its claim. Specifically, the third element of trade secret misappropriation requires that a plaintiff prove that the defendant is using the trade secret. In order to prove this element, M–I must establish that WES's tools incorporate M–I's design features. Indeed, M–I has submitted affidavits from two retained experts who state that they cannot come to any determination of whether WES has misappropriated M–I trade secrets in its own tool line without first inspecting tools drawings and other proprietary information. (Doc. No. 317, Exs. J & K.) The trade secrets are both relevant and necessary for that reason. Not being able to argue that certain tool diameters were identical, or that WES adopted the same unique material as M–I in the construction of its tools, would be fatal to M–I's claims. What Defendants seek in protection, then, is not a slight modification of discovery, but instead a dismissal of all of M–I's claims. This the Court cannot do. M–I's case has cleared the 12(b)(6) hurdle, and as such, it is entitled to certain discovery that will allow it to litigate this case. The Court finds that the trade secret drawings and other confidential information, which form the crux of this entire case, to be discoverable.

The Court is not convinced, as Defendants insist, that the deposition of the Scotland engineers exposed the frivolity of M–I's claims. Although all deponents stopped short of claiming that WES tools were exact copies of M–I tools, each of them was able to point to specific design features that were unique to M–I before WES launched its suite of wellbore cleanout tools. The engineers pointed to stabilizer sleeve sizes, pressure equalization

components, mandrel design, filter tool similarities, magnet type, tool material, bolts, and other dimensions, designs, and mechanisms that they strongly believe WES copied from M–I. From the Court's review of the testimony, it believes that the testimony was specific and supported by the engineers' technical knowledge about the designs and components of these tools. At the very least, they have boosted M–I's argument that examining drawings of these tools, and other information, is necessary to fairly adjudicate its misappropriation of trade secrets claim.

The Court does not finding convincing Defendants' citation to case law on trade secret protection. The seminal case interpreting and applying Rule 507, *In re Continental General Tire, Inc.,* is readily distinguishable. In that case, a driver's front tire blew out, and he struck an oncoming vehicle, killing two people. Certain heirs brought a products liability action against defendant, the manufacturer of the failed tire. Plaintiffs contended that either a design or manufacturing defect prevented the belts of the failed tire from properly bonding. During discovery, the plaintiffs requested defendant to produce the chemical formula for what is known at "skim stock," in order to prove its claim. 979 S.W.2d 609, 610 (Tex.1998). Defendant objected on the grounds that its skim stock formula was a trade secret protected by Rule 507. The Texas Supreme Court reviewed the underpinnings of Rule 507, established the burden shifting scheme outlined above for production of trade secrets under the rule, and applied that scheme to the facts before it. In that case, the only evidence put forward by plaintiffs to establish that the skim stock formula was necessary to the litigation was deposition testimony from defendant's expert stating that a compound that didn't have the right ingredients in it could cause tire failure. The unrefuted countervailing evidence, however, established that the formula could not determine the physical properties of a tire, that the finished tire itself had to be tested, and that plaintiffs had no other skim stock formulas with which to compare defendant's formula. In other words, the evidence did not show that production of the skim stock formula would allow plaintiff to establish that the failed tire was defective. The formula itself could not show the specific properties of the failed tire, and even if the formula was defective in some way, plaintiffs would not be able to show that by comparing the formula to others. In this case, by contrast, Defendants' tool drawings and other information will point directly to the design features of its wellbore tools (that is, because manufacturing flaws are not a concern in this litigation, the question of whether the drawings reflect *exactly* the final manufactured product is irrelevant); furthermore, M–I may compare Defendants' trade secrets to its own to establish whether Defendants' committed misappropriation.

The Court finds Defendants' other citations similarly unconvincing. In those cases, the courts rejected discovery of trade secret information where plaintiffs failed to indicate how the trade secret information would show whether the final product was defective, were able to prove defectiveness of products without discovery of the information, failed to establish that the information would be necessary to its experts rather than merely useful, or failed entirely to offer any evidence showing production was necessary. *See, e.g., In re Bridgestone/Firestone, Inc.,* 106 S.W.3d 730, 733–34 (Tex.2003); *In re XTO Res. I, LP,* 248 S.W.3d 898, 904 (Tex.App.-Fort Worth 2008, no pet.); *In re Waste Mgmt. of Tex., Inc.,* 286 S.W.3d 615, 618 (Tex. App.-Texarkana 2009); *In re Leviton Mfg. Co.,* 1 S.W.3d 898, 902–03 (Tex.App.-Waco 1999, no pet.); *In re Continental Tire N. Am., Inc.,* 74 S.W.3d 884, 886 (Tex.App.-

Eastland 2002, no pet.); *In re Frost*, 998 S.W.2d 938, 939 (Tex.App.-Waco 1999, no pet.) M–I does not stand in the same position as the plaintiffs in the cited cases. First, the manufacturing process is immaterial to whether Defendants misappropriated trade secrets. Second, as stated above, M–I will not be able to prove misappropriation of trade secrets, which requires them to show that Defendants have actually incorporated trade secrets into their own competitive products, without examining Defendants' tool drawings and other proprietary information. Last, M–I has proffered evidence on the issue of necessity, and that evidence establishes that experts must have access to proprietary information in order to prepare their conclusions. In other words, the information is necessary, not simply useful, for M–I's experts. The Court therefore rejects Defendants' attempts to analogize the instant litigation to cases where trade secret discovery has been rejected on Rule 507 grounds.

Additionally, neither party disputes that M–I has virtually no other source for the information. Although it may go after the manufacturers of the tools, a strategy that M–I has undertaken, this is simply a more circuitous way of obtaining the materials from WES itself. All of WES's manufacturers have signed confidentiality agreements not to disclose the trade secrets, and so have referred requested items to WES so that WES could assert the trade secret privilege.

The Court points out that it is not only WES's disclosure that is at issue here. Rather, it is clear that M–I will need to produce its own tool drawings and other information to Defendants so that Defendants may build their defense in this case. The Court is satisfied that, with both parties disclosing the material at the heart of their companies' success, each of them will have strong incentives to rigorously apply the protective order and safeguard one another's trade secrets. The Court trusts the attorneys on all sides of this case to abide by the terms of the protective order.

■ Parties are generally given wide latitude in conducting discovery, even as to trade secret matters. Indeed, in most cases concerning trade secret discovery, "the key issue is not whether the information will be disclosed but under what conditions." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2043 (2d ed.1994). The Supreme Court has recognized that "orders forbidding any disclosure of trade secrets or confidential commercial information are rare." *Fed. Open Market Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 363 n. 24, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). "More commonly, the trial court will enter a protective order restricting disclosure to counsel, or to the parties." *Id.* (internal citations omitted). Defendants have failed to cite to any federal cases that prohibited trade secret disclosure outright. Indeed, from the Court's own research, it is clear that such action is exceedingly rare. Defendants have failed to set forth compelling reasons for why this material should be entirely exempt from discovery. The Court finds that the material is relevant and necessary to the claims at issue in this case.

Of course, the Court prefers that the parties have a mutually agreeable protective order in place. Defendants have indicated that the current protective order is insufficient. The Court will convene the parties to discuss how the terms of the current protective order may be modified. Given the sensitive nature of the information, the Court is amenable to making the order as strict as possible to ensure the continuing secrecy of the information disclosed.

The Court makes one final point. It understands that Defendants are extremely frustrated with the filing of this lawsuit. Defendants have repeatedly argued to the Court that this is a sham lawsuit brought by a large corporation seeking to extinguish a small one. If this is true, of course, an allocation of costs and fees, as well as more serious measures, may be in order so that WES may be made whole again. But the Court is not in a position to dismiss an entire lawsuit at this stage based on Defendants' impassioned arguments and accusations. It is the Court's task to adjudicate this case neutrally. Having found no basis for Rule 12(b)(6) or Rule 56 dismissal of the entire suit, the Court must allow this litigation to proceed. It has concluded that, in order to try these claims, both sides must produce trade secret material. The merits of M–I's claims can form no basis for the Court's decisions at this phase. Rather, all it can do, and indeed what it is bound to do, is monitor the pleadings and evidentiary standards to ensure that the case proceeds in a way that protects all parties' rights. The Court tries to do so faithfully, and remains willing to discuss problems during discovery as they arise.

## V. CONCLUSION

For the reasons stated in the order, Defendants' motion to dismiss (Doc. No. 91) is granted in part and denied in part. Counts Four, Five, and Eleven are dismissed. Defendants' motion for partial summary judgment (Doc. No. 181) is granted in part and denied in part. Counts Four, Five, Six, Eight, Nine, Ten, and Twelve are preempted to the extent they are based on M–I's tool drawings and other copyrightable material. Defendants' motion for partial summary judgment is denied as to M–I's misappropriation of trade secrets claim, and its covenant not to compete argument. Defendants' motion for protection (Doc. No. 300) is denied.

M–I must file an amended complaint within twenty (20) days of the date of this Order that reflect the rulings herein.

**IT IS SO ORDERED.**